Argued April 5, affirmed September 3, 1976

OLSEN et al, *Appellants,*
*v.*
STATE ex rel JOHNSON et al,
*Respondents.*

554 P2d 139

*Leslie M. Swanson, Jr.,* Eugene, and *John E. McDermott,* Los Angeles, California, argued the cause for appellants. With them on the briefs were John B. Arnold, Johnson, Johnson & Harrang, Richard E. Miller, Miller, Moulton & Andrews, Jeffrey W. Brenner, Mark D. Brook, Charles O. Porter, Eugene, and David C. Long, Washington, D. C.

*W. Michael Gillette,* Solicitor General, Salem, argued the cause for respondents. With him on the brief were Lee Johnson, Attorney General, Peter S. Herman, Senior Counsel, and Ira W. Jones, Senior Assistant Attorney General, Salem.

Mark C. McClanahan, Donald A. Burns and J. Barrett Marks, of Miller, Anderson, Nash, Yerke & Weiner, Portland, filed a brief amicus curiae on behalf of Portland School District.

Before McAllister, Presiding Justice, and Denecke, Holman, Tongue, Howell and Bryson, Justices.

DENECKE, C. J.

**DENECKE, C. J.**

The plaintiffs contend that the system of Oregon public school financing is contrary to Art I, § 20, of the Oregon Constitution, Oregon's Equal Protection Clause. Plaintiffs also contend that the system is contrary to Art VIII, § 3, of the Oregon Constitution which provides that the legislature shall provide a "uniform and general system" of schools. The trial court found against the plaintiffs and they appeal.

The essence of plaintiffs' argument is that under the Oregon system the amount of money available for education depends upon the value of the property in the individual school districts and this varies greatly. They further contend that this variation in wealth results in unequal educational opportunities for the children of the state.

I

Oregon School Financing System

The Oregon system of school financing is generally similar to that in other states. The percentages of revenue from the various levels of government varies, however, from state to state. The government levels providing funds for education are the local school district, the county, the state, and the federal government. The latest figures in evidence were for 1972-1973. That year Oregon spent 603 million dollars on public elementary and secondary education. The state supplied 16 per cent, local government supplied 78 per cent, and the federal government 4 per cent. The local source of revenue is largely the property tax and the state source is primarily the income tax.

Basically, Oregon has three kinds of school districts: unified, providing education from grade one through twelve; elementary, providing education from grade one through grade six or eight; and high school, providing education from grade seven or nine through twelve. In comparable districts the difference in true cash value per pupil between districts is substantial.

[ 11 ]

For example, in unified districts, those educating grades one through twelve, the wealthiest district had a true cash value per pupil of $203,000, while the poorest had a true cash value per pupil of $19,000. Likewise, the expenditure per district varies substantially. For example, in unified districts, the expenditures varied from $1,795 spent per pupil to $674 spent per pupil.

The amount of tax a property owner pays per $1,000 value of property likewise varies between districts. Comparing some selected districts, the rate varied from $20 per thousand to $9 per thousand. The rate per thousand was generally higher in those districts having less value per pupil. However, this was not necessarily so; some districts having more wealth per pupil taxed themselves for education at a higher rate per thousand than districts with less wealth per pupil. The ratio between wealth and tax rate also substantially varies; that is, districts with, for exemple, three times as much wealth per pupil have a tax rate greater than, about the same as, or, in the extreme instance, one-half as large as other districts with less wealth per pupil.

Why the present school districts of Oregon have their present geographical boundaries is not clear. Deady, General Laws of Oregon (1842-1872), ch 4, § 25, subsection 1, p 506, provided that the county school superintendent should lay out his county into convenient school districts and keep records showing the boundaries. Subsection 3 provided the county superintendent could not change the boundaries unless a majority of those in the affected districts agreed.

Now, the Intermediate Education District (IED) Board is the district boundary board. ORS 330.080. The board, on its own motion or the petition of three residents, is authorized to merge districts or alter boundaries:

"* * * * *.

"(2) * * * [I]f it finds that the proposed change:

"(a) Will have no substantial adverse effect upon the ability of the districts affected to provide the educational program required by law.

[ 12 ]

"(b) Will result in improvement of the educational facilities available to the children in the area affected by the proposed change or will result in substantial operating economies in the districts affected.

"(c) Is not made solely for tax advantages to the property owners in the district or area affected by the proposed change." ORS 330.090[1]

If 5 per cent or at least 500 voters in an area remonstrate against the proposed change, the proposed change must be submitted to the voters in the affected area. If a majority opposes the change, it cannot be effected.

Oregon has had a history of a great number of school districts,—elementary, union high school, and rural. In 1939 there were over 2,100 school districts. In 1939 the legislature empowered the counties to "determine what boundaries stand in the way of providing satisfactorily for the support and operation of the schools and the education of the children." Oregon Laws 1939, ch 468, § 4, p 918. The counties were then to provide a plan for reorganization of the districts.

Pursuant to this authorization, plans were prepared which provided for the elimination of 243 districts. The legislative authorization also provided that the voters of the affected districts could reject the proposed plan if they so voted. The voters rejected all 243 proposed eliminations. A Study of Public Elementary and Secondary Education in Oregon (The Holy Report 1950). Subsequently, however, there has been a marked reduction in the number of school districts and it appears from the evidence that there are now about 400 school districts in Oregon.

As stated, in 1972-1973 the state supplied 16 per cent of the funds for public school education. In 1972-1973 that was 111 million dollars. Most of these funds are distributed as Basic School Support. Most of this support is distributed on the following basis: flat

---

[1]There are other standards not relevant to any consideration here.

grants; that is, so much money per pupil to each district. In 1972-1973 flat grants were in the amount of 79 million dollars. About 15 million was used for equalization. The remaining sums were used for paying for district transportation and miscellaneous purposes. These equalization funds are distributed in inverse order of the taxable wealth in the district.

Before discussing these funds further it is necessary to explain the state fixed "minimum acceptable level of school support." This is the minimum amount per pupil the state yearly determines must be spent for educational purposes. For example, in 1971-1972 the state determined that every district had to spend, from all sources, $593 per pupil to maintain a satisfactory level of educational opportunity.

Every year the state also sets the minimum tax rate which districts must levy in order to be eligible to receive equalization funds. For example, in 1971-1972 the state required districts to levy up to $13.24 per $1,000 value. This is not completely accurate as a district with high values per pupil does not have to set the levy at this rate in order to contribute the amount the state sets as the "minimum acceptable level of school support."

Equalization funds are distributed by the state as follows, using 1971-1972 as an example: $593 per pupil was set as the minimum to be expended by each district. To raise this amount each district was given a flat grant of $148 per pupil. Each district was required to tax the property in its district up to the rate of $13.24 per $1,000. If a levy at this rate did not raise the balance to achieve $593 per pupil, the state paid the district from the equalization funds sufficient sums to enable the district to meet the $593 minimum.

Another device created to equalize the moneys available for the school districts is the IED. ORS ch 334. These are generally formed along county lines. One of the prime purposes of an IED was to equalize the funds available to the various districts within the IED and yet

have the districts retain optimum local control. ORS 334.005. Equalization by this procedure has not succeeded. Voters in the IEDs have voted down taxing levies for equalization. The common belief is that the voters in the wealthier districts would not tax themselves to aid the poorer districts.

Several Oregon counties receive substantial sums from the federal government because of timber lands known as Oregon and California Lands (O & C), located in these counties. Twenty-five per cent of these funds are transferred to the county school funds in these counties. ORS 294.060. These funds are not taken into account in determining which districts are entitled to equalization funds and the amount of equalization required. ORS 328.005(2).

Another complicating factor in the Oregon school financing system is the timber severance tax. Timber in eastern Oregon is not subject to an ad valorem tax. On harvesting, owners of eastern Oregon timber pay a severance tax. In western Oregon timber is assessed an ad valorem tax; only upon 30 per cent of the value of the timber, however. On harvesting, the owners pay a severance tax on 70 per cent of the value of the harvest value of the timber. In eastern Oregon timber is not included in determining the value of the taxable property in the school district. In western Oregon only 30 per cent of the value is included. Private timber holdings are scattered all over Oregon with some districts having none and others having substantial private timber holdings.

II

Equal Protection Clause of the
Oregon Constitution

As stated, the plaintiffs challenge the statutes on the grounds that they violate the equal protection clause of the Oregon Constitution. We have repeatedly and explicitly held or unequivocally inferred that the scope of the equal protection clause of the Oregon

Constitution and the Fourteenth Amendment is the same:

"The controlling principles which guide the courts in determining questions of alleged unconstitutional discrimination or class legislation are the same whether it is the equal protection clause of the Fourteenth Amendment of the Constitution of the United States which is invoked, or the privileges and immunities provision in Art I, § 20 of the Oregon Constitution. * * *." *Plummer v. Donald M. Drake Co.,* 212 Or 430, 437, 320 P2d 245 (1958).

Recently in *Duerst v. Limbocker,* 269 Or 252, 525 P2d 99 (1974), a party attacked the Oregon guest statute upon the ground that it violated the equal protection clauses of both the Federal and Oregon Constitutions. We held that the guest statute was not invalid and made no distinction between the Federal and Oregon Constitutions.[2]

This does not mean that we cannot decide that the equal protection clause of the Oregon Constitution is broader than that of the Federal Constitution. *State v. Childs,* 252 Or 91, 99, 447 P2d 304 (1969); *Deras v. Myers,* 272 Or 47, 535 P2d 541, 549 and n 17 (1975). As in *State v. Childs, supra* (252 Or at 99): "We do not believe there is any legal basis for such a construction."

In *San Antonio School District v. Rodriguez,* 411 US 1, 93 S Ct 1278, 36 L Ed2d 16, reh den 411 US 959, 93 S Ct 1919, 36 L Ed2d 418 (1973), the United States Supreme Court held the Texas school financing scheme was not contrary to the equal protection clause of the Fourteenth Amendment.

The basic facts in that case were that in the San Antonio area the poorest school district had property of an average value of $6,000 per pupil, whereas the

---

[2] Professor Linde points out that it is not entirely accurate to state that the federal and Oregon constitutional provisions are equivalents. Linde, *Without "Due Process"—Unconstitutional Law in Oregon,* 49 Or L Rev 125, 141 (1970). We acknowledged this difference in *School Dist. No. 12 v. Wasco County,* 270 Or 622, 628, 529 P2d 386 (1975). However, for the purposes of this case this distinction is not relevant.

wealthiest had property of a value of $49,000. The property tax in the poorest district raised $26 per pupil, whereas the wealthiest district raised $333 with a lower tax rate. State support supplied $222 per pupil in the poorest district and $225 in the wealthiest district. From all funds, the poorest district spent $356 per pupil and the wealthiest $594.

The Court used the analysis it has been using in other equal protection cases: Was the classification on the basis of a "suspect" class or did the legislation "impinge on a fundamental interest"? If either should be found, the legislation will be subject to "strict scrutiny"; that is, the state has a heavy burden to justify the legislation. If neither is found, the legislation will be examined to determine if it "rationally furthers some legitimate, articulated state purpose." 411 US at 17.

The Court found the classification was not based upon wealth; therefore, it was not suspect; the legislation did not discriminate against poor families; poor families are not necessarily concentrated in school districts with relatively low wealth.

The Court also found the classification was not suspect because it did not absolutely deprive persons of the desired benefit; that is, the students in the poorest district were not totally deprived of an education; possibly they were deprived of a higher quality education. The Equal Protection Clause does not require "precisely equal advantages." 411 US at 24.

The Court also found there was no evidence that the lower the family income in a district, the lower the dollar amount spent for education in the district.

The Court also decided that the Texas system did not impermissibly interfere with a "fundamental right"; that is, education. It so held because of the opinion that to be a fundamental right, the right must be explicitly or implicitly recognized in the Constitution. Education is not so recognized.

[ 17 ]

It further held that if a basic minimal education is constitutionally protected, there was no charge that a basic minimal education was not provided in all districts.

The Court then went on to decide that the school financing legislation rationally furthered a legitimate state purpose. That purpose is the local control of schools. That discrepancy in the wealth of the districts gave some districts less control than others was found to be insufficient to strike down the entire system.

Two years earlier the California Supreme Court in *Serrano v. Priest,* 5 Cal3d 584, 96 Cal Rptr 601, 487 P2d 1241 (1971), held to the contrary. That case was decided upon the basis of allegations in the complaint. The California system of school financing was generally similar to that of Texas. The state supplied some support, but the major source of school revenue was the local property tax. The California court held the school financing system classified on the basis of wealth. It also decided that education is a "fundamental interest." As a result of these two holdings the California court applied the "strict scrutiny" test and concluded that state system of school financing is not necessary to accomplish a compelling state interest.

Only a three-judge federal district court, in an opinion by Judge Skelly Wright, held as did *Serrano. Hobson v. Hansen,* 327 F Supp 844 (DC 1971).

The New Jersey court in *Robinson v. Cahill,* 62 NJ 473, 303 A2d 273, reh 67 NJ 333, 339 A2d 193 (1975), held the system of financing did not violate the federal or state Equal Protection Clauses, but did violate the education section of the New Jersey Constitution.

The following decisions held the school financing systems were valid: *Thompson v. Engelking,* 96 Idaho 793, 537 P2d 635 (1975); *Northshore School District No. 417 v. Kinnear,* 84 Wash2d 685, 530 P2d 178 (1974); *Milliken v. Green,* 390 Mich 389, 212 NW2d 711 (1973); *Shofstall v. Hollins,* 110 Ariz 88, 515 P2d 590 (1973).

We share the same reluctance the New Jersey court, speaking through then Mr. Chief Justice Weintraub, had in using the complete analysis the United States Supreme Court used in *Rodriguez. Robinson v. Cahill, supra* (62 NJ at 490-1).

We do not have any difficulty following that part of the analysis which asks whether the classification is made on the basis of a suspect class such as race or sex and, if so, holding that such a classification is subject to a strict scrutiny. Plaintiffs, however, do not advance this contention. We assume they do not because they contend the federal and state Equal Protection Clauses should be similarly interpreted and *Rodriguez* held that under the Federal Constitution the classification by the taxable wealth of the local district was not a suspect class.

Plaintiffs contend, however, that the classification is subject to strict scrutiny because it impinges upon a fundamental interest. *Rodriguez* does not answer this for the Oregon Constitution. *Rodriguez* held the classification did not impinge upon a fundamental interest because the right to education is not "explicitly or implicitly guaranteed by the [U. S.] Constitution." 411 US at 33. Plaintiffs assert that education is a fundamental interest in Oregon because Art VIII of the Oregon Constitution is devoted entirely to the state's public school system.

We share New Jersey's opinion that this approach of categorizing an interest as a fundamental or nonfundamental interest and deciding this issue upon the basis of whether the interest is explicitly or implicitly guaranteed by the Constitution, is not a helpful method of analysis. *Robinson v. Cahill, supra* (62 NJ 473). This is particularly true in Oregon where many laws which are usually considered legislation are inserted in the Constitution. For example, Art I, § 39, of the Oregon Constitution, Oregon's Bill of Rights, provides that it is a guaranteed constitutional right to sell and serve intoxicating liquor by the drink. According to the

[ 19 ]

analysis of *Rodriguez,* this would make that right a "fundamental interest."

The weakness of this method of analysis we believe is also illustrated by comparing *Serrano* and *Rodriguez. Serrano* was decided before *Rodriguez* and the California Supreme Court held the interest was fundamental. The California court relied upon *Brown v. Board of Education,* 347 US 483, 74 S Ct 686, 98 L Ed 873, 38 ALR2d 1180 (1953), as the classic expression of the principle that education is a fundamental interest. The Court in *Rodriguez* stated, however, that while Brown recognized the obvious fact that education was important: "But the importance of a service performed by the State does not determine whether it must be regarded as fundamental for purposes of examination under the Equal Protection Clause." 411 US at 30.

We prefer the approach made by the New Jersey court in *Robinson v. Cahill, supra* (62 NJ 473). Its approach could be termed a balancing test. Under this approach the court weights the detriment to the education of the children of certain districts against the ostensible justification for the scheme of school financing. If the court determines the detriment is much greater than the justification, the financing scheme violates the guarantee of equal protection.

> "* * * Ultimately, a court must weigh the nature of the restraint or the denial against the apparent public justification, and decide whether the State action is arbitrary. In that process, if the circumstances sensibly so require, the court may call upon the State to demonstrate the existence of a sufficient public need for the restraint or the denial. * * *." 62 NJ at 492.

This is a combination of the two-step analysis used by the Supreme Court. How important is the interest impinged upon,—educational opportunity, as balanced against the state objective in maintaining the present system of school financing,—local control?

Such an analysis probably creates no more predictability than the "fundamental interest" standard. This method of analysis, however, seems to better expose the

court's reasoning in reaching its decision as compared to distinguishing between what is important and what is fundamental.

First, we will attempt to evaluate the interest impinged upon,—educational opportunity.

The present financing system does not totally deprive the children of the poorest district in Oregon (meaning the lowest value of property per pupil) of an education or of the use of some of the tools and programs believed to enhance education. Examples of the latter range from teachers and books to shop equipment and gymnasiums.

The poorer districts, however, do not have the tools and programs in the same number or quality as most of the wealthier districts. A witness compared the educational opportunities between one of the plaintiffs, School District 40, the Creswell District of Lane County, a poor district, and School District 68, the McKenzie District of Lane County, a wealthy district. Creswell has about 1,000 students and McKenzie about 500. Creswell has property of a value of $24,000 per pupil and McKenzie, $118,000 per pupil.

In the field of career education, McKenzie has greater offerings. Creswell can offer only three clusters; those are in business education, construction, and vocational agriculture. A cluster is a group of related occupations. However, because of Creswell's financial problems, it may lose its capable vocational agriculture instructor and have to cease its annual week's field trip for the vocational agriculture students. On the other hand, McKenzie has no vocational agriculture cluster.

McKenzie has an excellent program to keep students in school who otherwise would drop out. As a result, it has a low drop out rate. Creswell has no special program for potential dropouts and it has a high drop out rate. Creswell does have a limited program to put students into special groups in order to take care of their special needs, but McKenzie has a much more developed program of this kind.

Creswell is in need of additional classroom space and should spend more for building repair and renovation and for building maintenance. Creswell needs its incandescent lights exchanged for fluorescent lights, a math laboratory, and a self-contained classroom for disadvantaged students and those needing remedial instruction. Apparently, McKenzie has fulfilled these needs.

McKenzie has a full-time vice principal; Creswell needs one. Creswell should have a woman counselor to counsel the girls. It also should have a full-time developmental reading teacher in high school as McKenzie has. Creswell needs another full-time homemaking teacher and a school nurse. McKenzie has a kindergarten teacher and Creswell does not.

Creswell just acquired a physical education teacher for the elementary school; McKenzie has two, a man and a woman. Creswell has a half-time librarian and a library aide while McKenzie has a full-time librarian and a teacher aide. The evidence is not clear but probably is that teachers' salaries are lower in Creswell than in McKenzie.

Educational opportunity in the Creswell elementary school is the superintendent's greatest concern. The average pupil load for the Creswell elementary teachers is 21.4 while the average load at McKenzie is 16.7. Creswell also has a combined room for fifth and sixth grades; McKenzie has separate rooms for the two grades.

This is not a complete comparison of the two districts but states those items stressed by the superintendent.

We accept the expert evidence that the deficiencies of the Creswell district are substantial deficiencies in educational opportunities. The superintendent, however, was of the opinion that despite Creswell's financial difficulties, "we are much better than what you would ordinarily consider 'fair' to mean."

The legislature has not expressly stated any objec-

tive that is to be attained by its system of school financing.

The only objective to be attained by the present system of school financing advanced by the defendants in this case and the only objective stated in *Rodriguez* and in the cases from other jurisdictions is local control of schools; that is, control by the voters of the district through the elected board. The control is exerted by determining how much money should be raised for schools and how the money raised should be spent. While this objective has not been stated explicitly in Oregon laws, we believe it has been apparent from the beginning of statehood.

From the beginning, education relied upon a tax on the real property in the district plus the income and proceeds of the sale of lands set aside in the Admission Act for school purposes. The school district directors, elected by the voters of the district, governed the operation of the schools. Deady, General Laws of Oregon (1842-1872), ch 4, § 37, p 510. The state legislature exerted very little control. Deady, General Laws of Oregon, *supra,* ch 4, Title V, p 513.

ORS 332.072 provides today: "Pursuant to law, district school boards have control of the district schools and are responsible for educating children residing in the district." The state has now assumed more supervision. The State Board of Education is directed to establish state standards. ORS 326.051.

The local control argument is generally based upon the political principle that the governmental body supplying the funds, despite initial protestations to the contrary, ultimately directs how the funds shall be spent.

The plaintiffs concede that local fiscal control is a worthwhile objective. They contend, however, that the present system diminishes local control for the poorer districts; that is, they cannot raise enough money to give them any options; the poorer districts must use all

their funds to fulfill state requirements. Some of the experts testified to such conclusions but the specific evidence does not substantiate such broad conclusions.

The evidence is that the poorer districts do not have as much local fiscal control as the wealthier districts but it is not that the poorer districts have no local fiscal control. For example, as stated, the superintendent of the Creswell district testified his district had an outstanding vocational agriculture program in Creswell and McKenzie had none. He testified the district had this program because some people wanted it and were willing to have the board use tax dollars for it rather than spend the funds on some other program. He was concerned about the survival of this program as a quality program; however, this was because of inflationary pressures which affect all districts.

That some districts have less local control than others because of the disparity in the value of the property in the district does not lead to the conclusion that the Equal Rights Clause has been violated.

"* * * While it is no doubt true that reliance on local property taxation for school revenues provides less freedom of choice with respect to expenditures for some districts than for others, the existence of 'some inequality' in the manner in which the State's rationale is achieved is not alone a sufficient basis for striking down the entire system. *McGowan v. Maryland,* 366 US 420, 425-426, 6 L Ed2d 393, 81 S Ct 1101 (1961). * * *." *San Antonio School District v. Rodriguez, supra* (411 US at 50-51).

The plaintiffs' contention that the objective of local control is not furthered by reliance on local taxes would logically reach far beyond the function of providing educational opportunity. In Oregon, as well as most states, local government has raised funds locally to furnish services that are provided by local government. Examples of such service are police and fire protection, streets and certain utilities. At least some of these services must be placed in the "important" category. If the state's primary reliance on local taxes to fund

education is unconstitutional, its primary reliance on local taxes to fund some of these other services would seem to be equally violative of the Equal Protection Clause. Yet this tradition of local government providing services paid for by local taxes existed at the time of statehood and continues to be a basic accepted principle of Oregon government.

In Oregon this emphasis on local control is constitutionally accentuated. Art XI, § 2, and Art VI, § 10, of the Oregon Constitution provide for home rule by cities and counties; that is, the voters of the cities and counties can enact their own charters which shall govern on matters of city or county concern.

The majority in *Rodriguez* had the same concern that the issue extends further than providing educational opportunities:

"Moreover, if local taxation for local expenditures were an unconstitutional method of providing for education then it might be an equally impermissible means of providing other necessary services customarily financed largely from local property taxes, including local police and fire protection, public health and hospitals, and public utility facilities of various kinds. We perceive no justification for such a severe denigration of local property taxation and control as would follow from appellees' contentions. It has simply never been within the constitutional prerogative of this Court to nullify statewide measures for financing public services merely because the burdens or benefits thereof fall unevenly depending upon the relative wealth of the political subdivisions in which citizens live." 411 US at 54.

The New Jersey court saw the same implications:

"* * * It is undeniable that local expenditures per pupil do vary, and generally because other essential services must also be met out of the same tax base and the total demands exceed what the local taxpayers are willing or able to endure. But for the same reason similar discrepancies, both as to benefits and burdens, can be found with respect to the other vital services which the State provides through its local subdivisions. The equal protection proposition potentially implicates the basic

[ 25 ]

tenet of local government that there be local authority with concomitant fiscal responsibility. * * *." *Robinson v. Cahill, supra,* 62 NJ at 499-500.

The plaintiffs assert that there are alternative systems of financing education which would eliminate some of the inequalities in the present system and retain and enhance local control. Assuming this is correct, our present system is not thereby rendered invalid:

"* * * Nor must the financing system fail because, as appellees suggest, other methods of satisfying the State's interest, which occasion 'less drastic' disparities in expenditures, must be conceived." *San Antonio School District v. Rodriguez, supra* (411 US at 51).

### III
### Art VIII, § 3, of the Oregon Constitution Requiring a "Uniform" System of Oregon Schools

Apart from the equal protection contention, plaintiffs urge that the Oregon school financing system violates Art VIII, § 3, of the Oregon Constitution. Section 3 provides: "The Legislative Assembly shall provide by law for the establishment of a uniform, and general system of Common schools."

We have never been called upon to interpret that provision in any context which would make our decisions helpful in this case. *Harris v. Burr,* 32 Or 348, 367, 52 P 17, 39 LRA 768 (1898); *School Dist. v. American Surety Co.,* 129 Or 248, 257, 275 P 917 (1929).

The primary argument of plaintiffs is that "uniform" as used in Art VIII means that the amounts available for providing educational opportunities in every district must approach equality.

We do not so interpret Art VIII. The plaintiffs are silent on whether they believe "uniform," as used in Art VIII, requires equality in educational areas other than moneys available for educational opportunities. For example, in physical facilities or programs. Because of

plaintiffs' regard for local control of education, we assume they do not believe uniformity is required in other areas. We cannot determine any logical difference between uniformity in finances and uniformity in other areas.

■ We are of the opinion that Art VIII, § 3, is complied with if the state requires and provides for a minimum of educational opportunities in the district and permits the districts to exercise local control over what they desire, and can furnish, over the minimum.

In *Serrano v. Priest, supra* (5 Cal3d at 595-596), the California court considered a California constitutional provision requiring that the legislature shall provide for "a system of common schools." It held:

"* * * However, we have never interpreted the constitutional provision to require equal school spending; we have ruled only that the educational system must be uniform in terms of the prescribed course of study and educational progression from grade to grade. * * *."

It then proceeded to hold the California system violated the equal protection clause of the Fourteenth Amendment.

On the other hand, New Jersey in *Robinson v. Cahill, supra* (62 NJ at 501), held the New Jersey system did not violate the Federal Constitution but violated a provision of the New Jersey Constitution, stating: " 'The Legislature shall provide for the maintenance and support of a thorough and efficient system of free public schools * * *.' " The New Jersey court appears to have reached that conclusion partly because of the constitutional and legislative history of New Jersey school financing. Oregon has no comparable history.

We hold that the Oregon System of school financing does not violate the Oregon Constitution. Our decision should not be interpreted to mean that we are of the opinion that the Oregon system of school financing is politically or educationally desirable. Our only role is to pass upon its constitutionality.

Affirmed.