Argued and submitted November 7, 1990, the judgment of the circuit court affirmed on different grounds May 2, 1991

## COALITION FOR
## EQUITABLE SCHOOL FUNDING, INC.;
Jennifer R. Stoller, a Minor,
by Judy Stoller, her guardian ad litem;
Jessica Dudley Casteel, a Minor,
by Theodore W. Casteel and Patricia M. Dudley,
her guardians ad litem;
Philip Andrew Lockwood
and Adam Benjamin Lockwood, Minors,
by Dolores Jean Lockwood, their guardian ad litem;
Ryan Brink, a Minor,
by Shaun Brink, his guardian ad litem;
Shannon Marie Sutch, a Minor,
by Edwin Paul Sutch, her guardian ad litem;
Jennifer Diane Lindstrom, a Minor,
by Diane L. Lindstrom, her guardian ad litem;
Angella K. Graves, a Minor,
by Susan K. Graves, her guardian ad litem;
Jesse M. Longhurst, a Minor,
by Gordon A. Longhurst, her guardian ad litem;
Sasha Marie Brown, a Minor,
by Rebecca L. Brown, her guardian ad litem;
Tristan W. Proett, a Minor,
by Stan W. Proett, his guardian ad litem;
Central Plaza; Bonnie Morris; Judy Stoller;
Patricia M. Dudley; Theodore W. Casteel;
Dolores Jean Lockwood; Shaun Brink;
Edwin Paul Sutch; Susan K. Graves;
Gordon A. Longhurst; Rebecca L. Brown;
Stan W. Proett and William Farmer,
*Appellants,*

*v.*

## STATE OF OREGON,
John A. Kitzhaber, M.D., Vera Katz,
Superintendent of Public Instruction
and State Board of Education,
*Respondents.*

(CC 89C-12361; CA A65419; SC S37429)

811 P2d 116

James M. Brown, of Enfield, Guimond & Brown, Salem, argued the cause for appellants. With him on the briefs was Joseph C. Guimond, Salem.

Virginia L. Linder, Solicitor General, Salem, argued the cause for respondents. With her on the briefs were Dave Frohnmayer, Attorney General, and Jerome Lidz and Kaye E. Sunderland, Assistant Attorneys General, Salem.

Robert D. Durham and Barbara J. Diamond, of Bennett & Durham, Portland, filed a brief on behalf of *amicus curiae* Oregon Education Association. Mr. Durham filed supplemental briefs.

William G. Paulus and Mark B. Comstock, of Garrett, Seideman, Hemann & Robertson, P.C., Salem, filed a brief on behalf of *amici curiae* Salem Area Chamber of Commerce,

Forest Grove Chamber of Commerce, Forest Grove Economic Development, Keizer Chamber of Commerce, Philomath Chamber of Commerce, Gresham Chamber of Commerce, Redmond Chamber of Commerce, North Clackamas Chamber of Commerce, Salem Economic Development Corporation, Salem Homebuilders Association, Josephine County Homebuilders, Salem Board of Realtors, Salem League of Women Voters and Norma Paulus.

Robert M. Johnstone, Bruce A. Zagar and George J. Zarzana, of Johnstone, Zagar & Zarzana, McMinnville, filed a brief on behalf of *amici curiae* Carlton Elementary School District 11, McMinnville School District 40, Newberg School District 27Jt and Sheridan School District 48J.

Robert C. Cannon, Marion County Legal Counsel, Salem, filed a brief on behalf of *amicus curiae* Marion County.

Terry Kay, Salem, filed an *amicus curiae* brief on behalf of himself.

GRABER, J.

## GRABER, J.

Plaintiffs[1] seek a declaration that Oregon's current method of funding public schools violates the state constitution. We hold that plaintiffs have failed to plead a valid claim.

Plaintiffs' second amended complaint alleges, among other things, that:

(1)　State statutes and administrative rules currently impose standards on school districts that are higher than the standards imposed in 1973. Those standards include, for example, graduation requirements, drug and AIDS education, and minimum pay rates for substitute teachers.

(2)　The state pays to school districts less money than they need to comply with all the state standards. Some school districts lack the financial resources to meet state standards; other districts of comparable size and type have adequate funds to do so.

(3)　School districts receive revenue from taxes on property within their boundaries. Districts' property tax rates per $1,000 of assessed value vary from $6.95 to $29.11. Among districts of comparable size and type, the assessed value of real property ranges from $97,882 to $453,497 per child served. Therefore, even property tax rates set at the same level generate different revenues from district to district.

(4)　During the 1988-89 school year, among school districts of comparable size and type, expenditures per pupil ranged from $2,596 to $5,832. The quality of educational opportunity depends substantially on availability of funds, which differs from district to district.

On the basis of those allegations, plaintiffs claim that the Legislative Assembly has failed to "provide by law for the establishment of a uniform, and general system of Common schools," in violation of Article VIII, section 3, of the Oregon

---

[1] Plaintiffs are a nonprofit corporation organized by 55 Oregon school districts; individual taxpayers; parents and other persons having control over school-age children; and school-age children who reside within school districts. The first claim for relief, under Article VIII, section 3, is brought by all plaintiffs; the second claim for relief, under Article I, section 32, is brought by plaintiff taxpayers; and the third claim for relief, under Article I, section 20, is brought by the individual plaintiffs.

Constitution;[2] that ORS 328.542, which authorizes school districts to levy taxes, violates the requirement of Article I, section 32,[3] that taxes be "uniform on the same class of subjects within the territorial limits of the authority levying the tax"; and that the statutes establishing basic school support, ORS 327.010 *et seq*,[4] deny the equal "privileges, or immunities" mandated by Article I, section 20.[5] Plaintiffs argue that those sections of the Oregon Constitution require the state (1) to provide to school districts sufficient state funds — without reliance on local property taxes — to satisfy *all* educational standards imposed by state law; (2) to guarantee that all public school students receive equal "educational opportunity" or equal "resources," without regard to the school districts in which they reside; and (3) to equalize the property tax burden on all property owners throughout the state.

Pursuant to ORCP 21A(8), defendants moved to dismiss the action, arguing that the current method of funding public schools does not violate the Oregon Constitution. Relying on *Olsen v. State ex rel Johnson,* 276 Or 9, 554 P2d 139 (1976), the circuit court granted the motion.[6] Plaintiffs appealed to the Court of Appeals, which certified the appeal to this court. ORS 19.210. We accepted the certification and now affirm the judgment of the circuit court on different grounds.

Before considering the merits, we address defendants' assertion that the passage of Article XI, sections 11b-11f, of the

---

[2] Article VIII, section 3, of the Oregon Constitution provides:

"The Legislative Assembly shall provide by law for the establishment of a uniform, and general system of Common schools."

[3] Article I, section 32, of the Oregon Constitution provides:

"No tax or duty shall be imposed without the consent of the people or their representatives in the Legislative Assembly; and all taxation shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax."

[4] ORS 327.010 *et seq* set out procedures for funding public schools and provide the formula for apportioning state funds to school districts.

[5] Article I, section 20, of the Oregon Constitution provides:

"No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which upon the same terms, shall not equally belong to all citizens."

[6] Before ruling on the merits, the circuit court dismissed the action against defendants Kitzhaber and Katz on the ground of legislative immunity. Because we affirm the judgment of the circuit court on the merits, we need not consider plaintiffs' argument that the court erred in dismissing those defendants from the case.

Oregon Constitution ("Measure 5")[7] renders this case "moot" and that we should, therefore, dismiss the appeal. On November 6, 1990, Oregon voters added sections 11b-11f to Article XI when they adopted Measure 5.

■    Defendants make two arguments. First, they argue that "the full dimensions of the changes [wrought by Measure 5] cannot be known until the legislature responds with implementing legislation." In essence, they are saying that the 1991 Legislative Assembly *may* correct the disparities of which plaintiffs complain. But that possibility begs the question, which is whether plaintiffs are entitled to prevail *now*. Defendants rely on *Mid-County Future Alt. v. Metro. Area LGBC,* 304 Or 89, 742 P2d 47 (1987). Their reliance is misplaced. In *Mid-County,* during the pendency of a contested annexation, the legislature expressly approved the Boundary Commission's order, so an opinion would have been only advisory. Here, in contrast, there is only the *potential* for legislation to alter the factual predicate of the questions presented. That is not enough to make this case moot.

■    Second, defendants argue that "the school financing scheme [after the passage of Measure 5] is very different from the scheme plaintiffs ask the court to declare unconstitutional." Perhaps. But difference, if there is difference, does not equal mootness. The issue before us, assuming the well-pleaded facts to be true, is: Could plaintiffs prevail now? Measure 5 does not moot that issue. It is, rather, a part of the law whose effect on the pleaded facts we must consider in our analysis. We turn to the merits.

In *Olsen v. State ex rel Johnson, supra,* this court held that Oregon's method of funding public schools did not violate Article I, section 20, or Article VIII, section 3, of the Oregon Constitution. Plaintiffs urge us to overrule *Olsen.* They argue that, in *Olsen,* this court failed adequately to consider the text and the history of Article VIII, section 3, and departed from established precedents; that this court has altered significantly the analysis of claims under Article I, section 20, since it decided

---

[7] The full text of Article XI, sections 11b-11f, of the Oregon Constitution is set out in Appendix A to this opinion.

*Olsen;*[8] that the plaintiffs in *Olsen* did not rely on Article I, section 32; and that the second amended complaint in this case alleges disparities greater than those alleged by the plaintiffs in *Olsen.*

In our view, however, the correctness of *Olsen v. State ex rel Johnson, supra,* is no longer the issue. The Oregon Constitution has changed in a relevant way since 1976, when *Olsen* was decided. The people have added a new provision that addresses specifically how public schools are to be funded: Article XI, section 11a (the "Safety Net").[9]

The 1987 legislature initiated the Safety Net by referring Senate Joint Resolution 3 to the electorate as Measure 2. Measure 2 proposed to add Article XI, section 11a, to the Oregon Constitution. It was intended to prevent closures of public schools. Official 1987 Special Election Voters' Pamphlet at 10, Explanation to Measure No. 2. On May 19, 1987, the voters adopted the Safety Net. The Safety Net allows school districts to continue to levy property taxes for operating purposes, without additional voter approval, in an amount "not in excess of the amount levied for operating purposes in the preceding year." Or Const, Art XI, § 11a(1).

In addition, the voters' adoption of Measure 2 implemented "chapter 16, Oregon Laws 1987 (Enrolled Senate Bill 278)." Or Const, Art XI, § 11a(4). The most significant portion of Senate Bill 278, for the purpose of this case, was Section 5, now ORS 328.725, which provides in part:

"(1) If, on September 28 of the fiscal year, in the judgment of a school district board, the school district does not have sufficient resources to fund school operations necessary to meet the requirements for a standard school[10] for that year,

---

[8] *See Hale v. Port of Portland,* 308 Or 508, 524, 783 P2d 506 (1989) (former method of analysis under Article I, section 20, has been superseded by more recent cases); *State v. Clark,* 291 Or 231, 630 P2d 810 (1981) (analyzing Article I, section 20).

[9] The full text of Article XI, section 11a, of the Oregon Constitution is set out in Appendix B to this opinion.

[10] ORS 328.715 provides the definitions for terms used in ORS 328.715 to 328.745 and in Article XI, section 11a, of the Oregon Constitution. ORS 328.715(3) defines a "standard school" as "a standard school as defined under rule of the State Board of Education." ORS 326.051(1)(a) requires the State Board of Education to establish state standards for public kindergartens and public elementary and secondary schools. The Department of Education's OAR 581-22-102(31) defines "state standards" as the administrative rules found in OAR 581, Division 22. OAR 581, Division 22, lists the requirements for standard schools, which range from curriculum requirements and

the school board must determine, as provided under ORS 328.725, the amount of the levy authorized under section 11a, Article XI, Oregon Constitution, and then shall certify a levy within the amount so determined * * *.

"(2)(a)   A school district board that has not adopted, by the date specified in paragraph (b) or (c) of this subsection, a budget that includes as resources only available resources, must revise its budget, in the manner provided under ORS 294.435(6), including as resources any revenues from the levy determined and certified under subsection (1) of this section, adjusting budgeted resources and reducing appropriations, if necessary, in the manner that will permit school operations necessary to meet the requirements for a standard school for the budget year."

A school district that falls under ORS 328.725(1) must adjust its budget to meet the requirements for a standard school for the budget year. ORS 328.725(2)(a). It must then certify a levy. ORS 328.725(1).

Plaintiffs argue, first, that the current, overall method of funding public schools offends Article VIII, section 3, of the Oregon Constitution. They assert:

"[T]he State has a duty to fund that which it requires. At this time in Oregon, State-imposed requirements exceed in cost funds provided by the State. The districts must raise remaining funds through the unquestionably disparate mechanism of the property tax. As a result of this mechanism, some schools cannot meet state standards and others meet those standards at levels substantially below even neighboring districts. Children are denied equality of educational opportunity and the Legislature has failed in its duty to provide by law for the establishment of a uniform and general system of common schools."

That is, plaintiffs contend that Article VIII, section 3, forbids two kinds of disparities: disparities between state standards and the amount of state funding,[11] and disparities among school districts in financial benefits or tax burdens.

---

required number of days of instruction to preventive education about drugs and AIDS.

[11] If the second amended complaint on its face left any doubt that plaintiffs are limiting their argument to the position that the state has an obligation to fund 100 percent of what it requires, their memoranda to the trial court in opposition to the motion to dismiss erased that doubt. For example, plaintiffs argued that their claim based on Article VIII, section 3, should survive, because school districts should be able to use local property taxes entirely on what they desire over and above state standards.

Plaintiffs cannot successfully base their claim on Article VIII, section 3, however, because another, more recent constitutional provision more specifically addresses the funding of public schools. We read the Safety Net to contemplate, for constitutional purposes, the kinds of disparities of which plaintiffs complain. When a party argues that a general constitutional provision forbids the state from doing something, the argument may be answered by a later-adopted constitutional provision that allows the state to do that very thing. That is the case here.

The Safety Net recognizes — and enshrines in the constitution — the permissibility of relying on local property taxes to fund public schools. When the people enacted the Safety Net, they were confronting expressly the problem of public schools that lacked assured funding sufficient to meet state standards. The people adopted a solution based on local funding. The Safety Net gives school districts greater power — and constitutional power, at that — than they possessed previously to levy property taxes, by allowing them to continue to levy, without additional voter approval, up to the amount levied in the prior year. More important to the present question, the Safety Net *explicitly directs school districts to meet state standards with property taxes.* Or Const, Art XI, § 11a(4); ORS 328.725. As described in the official explanation to the voters of the Safety Net:

> "If this measure is approved, a school district may levy one of the following in any year for operating purposes:
>
> "(1)   Its tax base as defined under current law and any additional taxes approved by district voters for that year; or
>
> "(2)   An amount that is no higher than the amount last approved by district voters.
>
> "If, by the end of September of any year, the school board determines it cannot operate a standard school, as defined by the State Board of Education, due to lack of sufficient financial resources, *the school board is required to:*
>
> "(1)   *Adjust the district budget to provide a standard school for a full school year with no more property taxes than were last levied; and*
>
> "(2)   *Levy taxes in an amount that results in a total levy for the year of no more than were levied the previous year.*

"A standard school must be one that meets the legal requirement that all school districts must meet in order to receive state basic school support funding." Official 1987 Special Election Voters' Pamphlet at 10, Explanation to Measure No. 2 (emphasis added).

Plaintiffs' claim, that all state requirements must be funded from state revenues, cannot survive.

By its fair import, the Safety Net also permits district-to-district disparities in taxation and level of funding per pupil. Those variations are inherent in a system that relies substantially on local *ad valorem* property taxes. *See* Official 1987 Special Election Voters' Pamphlet at 11-13, Arguments in Favor of Measure No. 2 (recognizing that school districts would continue to have different levels of taxes and different levels of funding). Moreover, another provision of Article XI — section 11 — allows voters in taxing units such as school districts to control the amount levied by controlling the tax base.[12] The constitution thus recognizes that school districts may have disparate amounts to fund public schools, depending on the amount that voters are willing to pay.

Measure 5 does not change those conclusions. Measure 5 does not purport to define — one way or another — the legislature's duty to do what plaintiffs claim that the state constitution requires it to do. Although Measure 5 is complex, its basic directive is straightforward: It limits the taxes that may be imposed on any property by limiting tax rates. Official 1990 General Election Voters' Pamphlet at 33, Explanation to Measure No. 5. Measure 5 also directs the Legislative Assembly, for five years, to "replace, from the State's general fund, any

---

[12] Article XI, section 11, of the Oregon Constitution provides in part:

"(2) The tax base of each taxing unit in a given year shall be one of the following:

"(a) The amount obtained by adding six percent to the total amount of tax lawfully levied by the taxing unit, * * * in any one of the last three years in which such a tax was levied by the unit; or

"(b) An amount approved as a new tax base by a majority of the legal voters of the taxing unit voting on the question submitted to them in a form specifying in dollars and cents the amount of the tax base in effect and the amount of the tax base submitted for approval. The new tax base, if approved, shall first apply to the levy for the fiscal year next following its approval."

revenue lost by the public school system because of the limitations." Or Const, Art XI, § 11b(5).[13] That directive says nothing, however, about whether funding must equal the entire amount required to meet state standards or about how state money must be distributed among school districts. Rather, it requires the state to appropriate for "the public school system" a certain amount of money for five years. *Ibid.*

To summarize, the Safety Net specifically addresses the funding of public schools. It requires reliance on local property taxes as a source of public school funding, including funding needed to meet state standards. It also contemplates and permits district-to-district differences in what taxpayers pay and what school children receive in per-pupil spending. Accordingly, plaintiffs do not state a claim under Article VIII, section 3. We do not hold that Article VIII, section 3, has become a dead letter. It still requires the state to "provide by law for the establishment of a uniform, and general system of Common schools." That requirement, however — whatever it still means — does not mean what plaintiffs in their complaint in this case argue that it means.[14]

The same reasoning applies to plaintiffs' other two constitutional challenges. Pared to the core, their attacks under Article I, section 32, and under Article I, section 20, also rely on the concepts that the state must fund centrally whatever it requires and that the constitution does not countenance disparities from one school district to another, with respect to either financial benefits or tax burdens. As we have already explained, the Safety Net contemplates and permits those disparities. In the same way that it answers plaintiffs' claim under Article VIII, section 3, the Safety Net also answers plaintiffs' claims under Article I, sections 20 and 32.

---

[13] The legislature may, however, "limit the total of such replacement revenue plus the taxes imposed within the limitations * * * in any year to the corresponding total for the previous year plus 6 percent." Or Const, Art XI, § 11b(5).

[14] The parties disagree about what, hypothetically, Article VIII, section 3, requires in areas other than the funding of public schools and what Article VIII, section 3, would mean for funding under different facts. We need not decide between their competing interpretations, because our decision is limited to whether the current method of funding public schools violates Article VIII, section 3, or Article I, sections 20 or 32, in the ways that plaintiffs assert. As is our practice, we limit ourselves to deciding the issues that the case fairly presents, and the issue before us in this case is the trial court's ruling on defendants' motion to dismiss plaintiffs' second amended complaint.

We hold that Oregon's method of funding public schools does not violate the Oregon Constitution in the ways that plaintiffs assert. We think it appropriate, however, to repeat an observation that this court first made in *Olsen v. State ex rel Johnson, supra:*

> "Our decision should not be interpreted to mean that we are of the opinion that the Oregon system of school financing is politically or educationally desirable. Our only role is to pass upon its constitutionality." 276 Or at 27.

The judgment of the circuit court is affirmed on different grounds.

# APPENDIX A

Article XI, sections 11b-11f, of the Oregon Constitution provide:

## Section 11b

"(1) During and after the fiscal year 1991-92, taxes imposed upon any property shall be separated into two categories: One which dedicates revenues raised specifically to fund the public school system and one which dedicates revenues raised to fund government operations other than the public school system. The taxes in each category shall be limited as set forth in the table which follows and these limits shall apply whether the taxes imposed on property are calculated on the basis of the value of that property or on some other basis:

### "MAXIMUM ALLOWABLE TAXES
For Each $1000.00 of
Property's Real Market Value

| Fiscal Year | School System | Other than Schools |
|---|---|---|
| 1991-1992 | $15.00 | $10.00 |
| 1992-1993 | $12.50 | $10.00 |
| 1993-1994 | $10.00 | $10.00 |
| 1994-1995 | $ 7.50 | $10.00 |
| 1995-1996 and thereafter | $ 5.00 | $10.00 |

"Property tax revenues are deemed to be dedicated to funding the public school system if the revenues are to be used exclusively for educational services, including support services, provided by some unit of government, at any level from pre-kindergarten through post-graduate training.

"(2) The following definitions shall apply to this section:

"(a) 'Real market value' is the minimum amount in cash which could reasonably be expected by an informed seller acting without compulsion, from an informed buyer acting without compulsion, in an 'arms-length' transaction during the period for which the property is taxed.

"(b) A 'tax' is any charge imposed by a governmental unit upon property or upon a property owner as a direct consequence of ownership of that property except incurred charges and assessments for local improvements.

"(c)  'Incurred charges' include and are specifically limited to those charges by government which can be controlled or avoided by the property owner

"(i)  because the charges are based on the quantity of the goods or services used and the owner has direct control over the quantity; or

"(ii)  because the goods or services are provided only on the specific request of the property owner; or

"(iii)  because the goods or services are provided by the governmental unit only after the individual property owner has failed to meet routine obligations of ownership and such action is deemed necessary to enforce regulations pertaining to health or safety.

"Incurred charges shall not exceed the actual costs of providing the goods or services.

"(d)  A 'local improvement' is a capital construction project undertaken by a governmental unit

"(i)  which provides a special benefit only to specific properties or rectifies a problem caused by specific properties, and

"(ii)  the costs of which are assessed against those properties in a single assessment upon the completion of the project, and

"(iii)  for which the payment of the assessment plus appropriate interest may be spread over a period of at least ten years.

"The total of all assessments for a local improvement shall not exceed the actual costs incurred by the governmental unit in designing, constructing and financing the project.

"(3)  The limitations of subsection (1) of this section apply to all taxes imposed on property or property ownership except

"(a)  Taxes imposed to pay the principal and interest on bonded indebtedness authorized by a specific provision of this Constitution.

"(b)  Taxes imposed to pay the principal and interest on bonded indebtedness incurred or to be incurred for capital construction or improvements, provided the bonds are offered as general obligations of the issuing governmental unit and provided further that either the bonds were issued not later than November 6, 1990, or the question of the

issuance of the specific bonds has been approved by the electors of the issuing governmental unit.

"(4)   In the event that taxes authorized by any provision of this Constitution to be imposed upon any property should exceed the limitations imposed on either category or taxing units defined in subsection (1) of this section, then, notwithstanding any other provision of this Constitution, the taxes imposed upon such property by the taxing units in that category shall be reduced evenly by the percentage necessary to meet the limitation for that category. The percentages used to reduce the taxes imposed shall be calculated separately for each category and may vary from property to property within the same taxing unit. The limitation imposed by this section shall not affect the tax base of a taxing unit.

"(5)   The Legislative Assembly shall replace from the State's general fund any revenue lost by the public school system because of the limitations of this section. The Legislative Assembly is authorized, however, to adopt laws which would limit the total of such replacement revenue plus the taxes imposed within the limitations of this section in any year to the corresponding total for the previous year plus 6 percent. This subsection applies only during fiscal years 1991-92 through 1995-96, inclusive."

## Section 11c

"The limits in section 11b of this Article are in addition to any limits imposed on individual taxing units by this Constitution."

## Section 11d

"Nothing in sections 11b to 11e of this Article is intended to require or to prohibit the amendment of any current statute which partially or totally exempts certain classes of property or which prescribes special rules for assessing certain classes of property, unless such amendment is required or prohibited by the implementation of the limitations imposed by section 11b."

## Section 11e

"If any portion, clause or phrase of sections 11b to 11e of this Article is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, the remaining portions, clauses and phrases shall not be affected but shall remain in full force and effect."

## Section 11f

"(1)   If a school district merges with one or more other school districts and the merger is first effective for a fiscal year beginning on or after January 1, 1991, the tax base of the school district shall be equal to the sum of the tax base amounts for each of the school districts included in the merger, as otherwise determined under subsection (2) of section 11 of this Article.

"(2)   Subsection (4) of section 11 of this Article does not apply to a school district. The Legislative Assembly shall enact legislation to carry out the provisions of this section, including the circumstances under which mergers occur."

# APPENDIX B

Article XI, section 11a, of the Oregon Constitution provides:

"(1)   Notwithstanding section 11 of this article, in any year, a school district may levy ad valorem property taxes for operating purposes in an amount that, together with other levies, is not in excess of the amount levied for operating purposes in the preceding year.

"(2)   A levy referred to in subsection (1) of this section shall not be considered in determining the limitation imposed under section 11 of this Article.

"(3)   Notwithstanding subsection (5) of section 11 of this Article, the question of establishing a new tax base by a school district may be submitted only once annually on a date specified by the Legislative Assembly.

"(4)   The Legislative Assembly shall by law implement this section. Notwithstanding sections 1 and 28, Article IV and section 1a, Article IX of this Constitution, the initial legislation, chapter 16, Oregon Laws 1987 (Enrolled Senate Bill 278), shall take effect on the effective date of this section."

**FADELEY, J.,** concurring.

I concur in the holding that the second amended complaint, filed in April 1990,[1] fails to plead sufficient facts to support the claim that the legislatively designed method of financing public schools violates any state constitutional provision relied on in that complaint. The school finance system is perilously close to the edge of the cliff of unconstitutionality, under the allegations of the complaint, but has not yet gone over the edge.

Three types of plaintiffs filed the complaint: first, a corporate association of 55 out of the 300 school districts in Oregon; second, a group of citizens owning property subject to locally levied property taxes; third, pupils from various school districts, represented by legally related adults for the purposes of the complaint. All three join in the claim that, in April 1990 and during the 1989-90 school year, the legislature (and the state government), violated the express provisions of Article VIII, section 3, of the Oregon Constitution.

That section requires that the legislature "shall provide by law for the establishment of a uniform, and general system of Common [*i.e.,* public] schools."

That constitutional provision is unusual because it states an affirmative duty which the legislature must perform. Most constitutional provisions limit governmental actions, restricting government from infringing guaranteed rights of the people. But the public school guarantee in section 3 is different. It requires action by the legislative branch of government to establish the means by which the right to a public school education may be enjoyed by all. Before turning to plaintiffs' specific allegations and arguments in support of their claims that this right has been violated, a selective review of the historical creation and development of this right, and of the funding necessary to its enjoyment in Oregon, is in order.

---

[1] That is, before Measure 5 was adopted, amending the state constitution to limit property taxes for public school support to one half of one percent of real value (*i.e.,* $5 per thousand dollars of taxable value).

## HISTORY OF THE
## PUBLIC EDUCATION RIGHT

When this nation was founded, its leaders recognized the importance of the contribution that each of its citizens must make if the nation and its novel philosophy of government were to succeed and survive. If governmental decisions were to reflect the consent of the governed citizenry and if those citizens were to express that consent by voting for or against their leaders and representatives, the citizens must be informed sufficiently to make wise choices. If the general citizenry were to be informed, they must be educated adequately in order to obtain, evaluate, publicly discuss, and then act upon the information about the problems facing the nation or one of its states or communities. It was seen by the founders that an education is necessary to the capacity for self-government; assuring the general availability of that educational ingredient for self-determination was seen as the duty of government.

As Thomas Jefferson put it:

"Establish the law for educating the common people, that is the business of the state to effect and on a general plan."[2]

Many of the early Oregon pioneers brought with them the concept that public schools promoted the public weal. Before Oregon statehood, the territorial inhabitants and government provided for common schools open to the public. II Bancroft, Oregon History 35; I *id.* at 201, 325. Astoria maintained such a school, insufficiently funded by taxes and fines we may note, in 1855-56, *see* 4 Oregon Historical Society Quarterly 25 (March 1903).

At statehood in 1859, Oregon's constitution contained Article VIII, section 3, in its present form and separate provisions establishing the common school fund and dedicating the proceeds from certain public lands to the support of

---

[2] The quotation appears thus inscribed in marble on Jefferson's Memorial at Washington, D.C. However, the two parts of the quotation appeared in separate letters to George Washington on June 4, 1785, and to George Wythe on August 13, 1786. 9 Boyd, The Papers of Thomas Jefferson 151 (1954); 10 *id.* at 245. The letter to Washington told him of congressional enthusiasm for a bill "for the more general diffusion of knowledge" and opined that it would "supersede" the charity schools that Washington had thought of.

public schools. Proceeds from this source soon proved inadequate to the task. By 1865, the public school at Astoria had developed to a nine-month school of over 100 pupils with a program "beyond the ordinary grades." *Id.* at 27.

At Eugene by 1871, a high school was a regular part of the public school offering. 2 Oregon Historical Society Quarterly 55, 69, 75 (1901). State law provided a two-mill property tax for public school support by that time, which was increased by 50 percent to three mills by a change in the law in 1872. *Id.* at 74. Finances for the Eugene public school consisted of a state apportionment, a significantly larger county apportionment, a substantial share of the "rate bill" money and "subscriptions," and some other funds. *Id.* at 75.

By the time of World War I, Oregon voters had decided to limit the rate of growth of local property tax levies to a percentage of the prior year's dollar levies. As Oregon entered the depression of the 1930s, state government, comforted by the new tax on incomes, started to wean itself away from property tax rate levies for state governmental purposes. At the end of World War II, an initiative statute mandated that the state pay basic school support of $50 per pupil to local districts from the income tax or other state general fund revenues. By the 1961-63 budget period, state appropriations to basic school support accounted for over one-third of the state general fund expenditure. By the 1989-91 budget period, state appropriations for public school support were well over $1,000 per pupil. However, local school district property tax levies greatly exceeded that amount, on a statewide average, for the same period.

As school property tax levies grew, so did voter resistance to approval of increases. In 1987, the legislature responded to the difficulties of obtaining property taxes to fund some local schools by referring to the voters the Safety Net proposal discussed in more detail in the court's opinion. This proposal did not contain any annual percentage increase in local dollar levy authority for the local schools affected by it.[3]

---

[3] Presently, 48 of the 300 school districts in the state are subject to the Safety Net for the local funding share.

## PLAINTIFFS' CONTENTIONS

Noting that state government establishes the requirement for a standard public school program and that these requirements are ever-increasing, plaintiffs first contend that the legislature is constitutionally compelled to pay to the school districts whatever amount of money is required to meet the state standards.

This contention is puzzling. School districts are creatures of the state government, created as governmental entities by legislative acts and charged by state law to perform an important state function. They appear to be part of the legislature's response to its constitutional duty to provide by law for the establishment of a uniform system of common schools. Moreover, the authority of school districts to levy property taxes for educational purposes is derived solely from state legislative acts. The same is true for district authority to spend public funds from state or local sources. Because it is based on a misapprehension of the place and role of school districts in the state governmental structure, plaintiffs' first contention is not persuasive. Indeed, as to the claim of the pupils that the legislature must assure them a legislatively established standard education — a claim with which I agree — creation of school districts empowered to levy local taxes for public educational purposes is the legislature's reaction to its duty to assure those pupils, and others, that constitutionally mandated system.[4]

Plaintiffs next contend that the constitutional duty is measured by equality of educational opportunity and that equality of opportunity is measured by the amounts spent per pupil in the more costly districts.

It is true, of course, speaking theoretically, that the legislature could gather back to itself the power to levy property taxes for educational purposes and, treating the state as a single levying district, exact property taxes at a single rate statewide. The legislature could then disburse the amount collected in equal amounts per pupil statewide. Other

---

[4] The Safety Net is a state response, not just a local one. It originated in the legislature and was sent out for a referendum. When the people adopted it, they also were the state acting in response.

methods of equalizing funds received with the level of tax effort exerted are also theoretically possible.

Plaintiffs, however, have not argued that the words "uniform * * * system" in the constitution require uniformity in dollars spent per pupil nor that only expenditure equality will provide equal educational results. I am not inclined to establish the constitutional meaning of the word "uniform" absent full argument from the pertinent parties on the point.

It is clear that a floor or minimum educational program may be implied by the term "uniform, and general" in context of a constitutional duty to assure an adequate education. It is also clear that funding per pupil could be so small that it would not pay for a minimally adequate program. (Indeed, the Safety Net only assures adequacy for a brief time. Since its adoption, the purchasing power of a dollar has declined by approximately 20 percent using the consumer price index as a guide.) However, an inadequate amount is not the same thing as an adequate but unequal amount.

Plaintiffs' pleadings fall short of alleging ultimate facts disclosing absolute inadequacy of the school financing system, as established by law as of April 1990, to fund the minimum adequate educational program, defined as one that meets the state standards. Plaintiffs do allege that various Oregon public school districts "receive from 35 percent to 86 percent of their required revenues" from local property taxes and that some, unnamed, "districts are unable to meet [state] standards and requirements."

That allegation is but a conclusion, not a pleading of fact about the minimum dollar cost per pupil of a state standard program and the inadequacy of all available tax or in lieu of tax resources provided under law to meet that minimum dollar amount in a specific district. *See* ORCP 18A.

## The Pupil Plaintiffs

The pupil plaintiffs allege that equality greater than that presently provided, even after taking state basic support into account, is required by the provisions of Article I, section 20, of the state constitution. That section prohibits a law "granting to any citizen or class of citizens privileges * * *

which upon the same terms shall not equally belong to all citizens." If the "privilege" involved is meant, in these plaintiffs' section 20 contention, to be that of the right to an adequate public school education, then this contention is not different than the claim under Article VIII, section 3, and it yields the same result.[5]

On the other hand, if the privilege granted to one pupil but not the other is supposed, for the sake of discussion, to mean the dollar amount spent on a pupil in the most costly program in the state, or even the statewide average dollar amount spent per pupil, then, I note that the parties have not presented argument on that point. Absent focused argument, I am not willing to apply to the words "equal privileges" a purely economic yardstick or to assume that a "class," for purposes of this section, may be based upon the relative economic wealth of the area where one lives.

State law requires a school program meeting minimum state standards. The fact that some districts, with local voter approval, maintain a program going beyond state standards does not, at first blush at least, establish that the "privilege" of a more costly education is thereby created or "granted," within the constitutional meaning of "privilege." No section 20 claim is made out by the pleadings.

*The Taxpayer Plaintiffs*

Taxpayer plaintiffs allege that Article I, section 32, requires equal rates of school property taxation statewide or equal benefits for equal rates statewide. It does not. It expressly requires tax uniformity "within the territorial limits of the authority levying the tax." *State ex rel v. Malheur County Court,* 185 Or 392, 412, 203 P2d 305 (1949). That levying authority is the school district. The legislature currently levies no direct school property tax.[6]

---

[5] Under that understanding of the "uniform * * * system" language, the question is whether the system is equal to the task of establishing standard schools throughout the state, not whether expenditures per pupil are substantially equal.

[6] Outcomes of Measure 5 are discussed in the appendix.

## APPENDIX

School property tax levies average about 1.7 percent statewide, or $17 per thousand of taxable value. Measure 5, not included in the allegations of plaintiffs' second amended complaint, will in a few years place a ceiling of 1/2 of 1 percent, or $5 per thousand of taxable value, on school property tax levies. This will be true whether the school property tax is levied statewide or district by district.

At the time plaintiffs filed their last complaint, a school district that had fallen into the Safety Net could climb out of the net by local voter approval of a new tax base authorizing levy of an increased dollar amount. Five out of six districts had avoided falling into the net through local voter approval of modern tax bases or of dollar levies exceeding a 6 percent annual growth rate, as computed on a district's approved tax base. (Of the 300 Oregon school districts, 48 are in the Safety Net.)

The provisions of Measure 5 purporting to cancel those local options for additional school funding are already effective. Because all school districts presently levy more than $5 per thousand — ranging from $6.95 to $29.01 — the Safety Net, in practical effect, is becoming a dead letter. Strong local voter support of local school tax levies or of new tax bases will no longer produce additional funding.

I agree with the court's opinion that adoption of Measure 5 does not moot the complaint as a technical legal matter. But the school financing rules will never be the same again. Measure 5 establishes new rules for local property taxation, the bulwark of Oregon public school finance for 150 years. Measure 5 cuts the deck in a different place than ever before and deals new cards to a differing group of players.

Some changes under Measure 5 are numerically portrayed in the attached bar graphs. The graphs reflect the current statewide average school property tax rate of $17 per thousand of taxable value. The first graph depicts an assumed district that levied at the rate of $17 per thousand in the year prior to falling into the net.

The second graph assumes a district that has not adopted a modern tax base but that has an old tax base

allowing a levy of $7 per thousand without local voter approval. To reach the $17 statewide average levy, this district obtains local voter approval to levy annually an additional dollar amount "outside the 6 percent limitation" that requires adding $10 per thousand to the rate of levy.

# SAFETY NET DISTRICT

## Before Measure 5

$17

District may vote
for new tax base
and climb out of
the net.

## After Measure 5

$5

No local vote
will alter.

# OLD TAX BASE DISTRICT

