Argued and submitted July 28, the judgment of the Tax Court is affirmed
September 3, 1992

In re Determination of the Applicability
of Article XI, section 11b, of the Oregon
Constitution to Bonded Indebtedness of
the City of Portland and the Portland
Development Commission, in Connection
with the South Park Urban Renewal District.

CITY OF PORTLAND,
Acting by and through
the Portland Development Commission,
*Appellant/Cross-Respondent,*

*v.*

Dorothy M. SMITH
and Peter M. Smith,
*Respondents/Cross-Appellants,*

*and*

Henry KANE
and Clyde V. Brummell,
*Respondents.*

(OTC 3156; SC S39350)

838 P2d 568

Timothy J. Sercombe, of Preston Thorgrimson Shidler Gates & Ellis, Portland, argued the cause for appellant/cross-respondent. With him on the briefs were Harvey W. Rogers and James N. Westwood, of Miller, Nash, Wiener, Hager & Carlsen, Portland.

Henry Kane, Beaverton, argued the cause and filed a response brief *in propria persona*.

Clyde V. Brummell, respondent *pro se*, argued the cause and filed a response brief.

Richard M. Stephens, Pacific Legal Foundation, Bellevue, Washington, argued the cause and filed a response brief and a reply brief for respondents/cross-appellants.

David Wu, of Cohen & Wu, Portland, filed a brief on behalf of *amici curiae* Ecumenical Ministries of Oregon and The

Urban League of Portland, Inc., in which *amici curiae* Korean Chamber of Commerce of Oregon, Inc., Chinese Consolidated Benevolent Association, and North/Northeast Economic Development Alliance, Inc., joined.

James E. Mountain, Jr., and Glenn Klein, of Harrang Long Watkinson Arnold and Laird, P.C., on behalf of *amici curiae* City of Eugene, City of Salem, City of Albany, and League of Oregon Cities, and Michael D. Reynolds, Assistant Solicitor General, Charles S. Crookham, Attorney General, Virginia Linder, Solicitor General, and Wendy Robinson, Assistant Attorney General, Salem, on behalf of *amicus curiae* Oregon Economic Development Department, filed a joint brief.

Oliver I. Norville, Portland, and Peter R. Mersereau, of Rankin Mersereau & Shannon, Portland, filed a brief on behalf of *amicus curiae* Association of Oregon Redevelopment Agencies.

Gregory W. Byrne, of Byrne, Barrow & Smith, Portland, filed a brief on behalf of *amici curiae* Thomas P. Dennehy, Don McIntire, Don Nelson, Harry Barnes, Ron Smith, Cathy Smith, Louann Sue Myers, Maurice Unis, Tom Nelson, Valerie Nelson, Gresham Health Club, Inc., Gresham Court Club, Inc., Jim Weston Pontiac-GMC, Inc., and Romaine McIntire.

Steven A. Moskowitz, Portland, filed a brief on behalf of *amici curiae* Association for Portland Progress, Beaverton Area Chamber of Commerce, Gresham Area Chamber of Commerce, Oregon Association of Minority Entrepreneurs, Oregon Downtown Development Association, Portland Metropolitan Chamber of Commerce, and Salem Downtown Association.

Before Carson, Chief Justice, Peterson, Gillette, Van Hoomissen, Fadeley, and Graber, Justices, and Richardson, Justice pro tempore.

PETERSON, J.

Graber, J., filed a dissenting opinion in which Richardson, J. pro tempore, joined.

### PETERSON, J.

In November 1990, as the result of an initiative, Oregon voters passed a constitutional amendment relating to property taxation and public school financing, commonly referred to, then and now, as Measure 5. Or Const, Art XI, § 11b. Measure 5 "limits the taxes that may be imposed on any property by limiting tax rates." *Coalition for Equit. School Fund. v. State of Oregon*, 311 Or 300, 310, 811 P2d 116 (1991). Measure 5 also provided that certain property taxes be exempt from its limitations:

"(3) The [property tax rate] limitations of subsection (1) of this section apply to all taxes imposed on property or property ownership except[:]

"(a) Taxes imposed to pay the principal and interest on bonded indebtedness authorized by a specific provision of this Constitution.

"(b) Taxes imposed to pay the principal and interest on bonded indebtedness incurred or to be incurred for capital construction or improvements, provided the bonds are offered as general obligations of the issuing governmental unit and provided further that either the bonds were issued not later than November 6, 1990, or the question of the issuance of the specific bonds has been approved by the electors of the issuing governmental unit." Or Const, Art XI, § 11b(3).

The City of Portland (City), acting by and through the Portland Development Commission, petitioned for a declaratory judgment in the Tax Court. ORS 305.589. City sought a declaration that the tax rate limitations in Measure 5 do not apply to property tax revenues that are used by City to pay off bonded indebtedness incurred by City to finance urban renewal projects. City asserts that those tax revenues are exempt under subsection (3)(a), quoted above, because they are taxes imposed to pay off "bonded indebtedness authorized by a specific provision of this Constitution." City claims that another provision of the constitution, Article IX, section 1c, does indeed authorize the urban renewal revenue bonded indebtedness.

Four intervening respondents opposed City's declaratory judgment action. On cross motions for summary judgment, the Tax Court granted summary judgment to

respondents, declaring that the Measure 5 tax rate limitations included property tax revenues dedicated to the repayment of urban renewal bonds, because urban renewal revenue bonds were not "bonded indebtedness authorized by a specific provision of [the Oregon] Constitution." *In re City of Portland*, 12 OTR 208 (1992). City filed a direct appeal in this court. ORS 305.445. We affirm the judgment of the Tax Court.

Article IX, section 1c, of the Oregon Constitution does set forth a procedure for paying urban renewal indebtedness. It provides:

> "The Legislative Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment or urban renewal project, may be divided so that the taxes levied against any increase in the true cash value, as defined by law, of property in such area obtaining after the effective date of the ordinance or resolution approving the redevelopment or urban renewal plan for such area, shall be used to pay any indebtedness incurred for the redevelopment or urban renewal project. The legislature may enact such laws as may be necessary to carry out the purposes of this section."

Obviously, the quoted provision makes no mention of bonded indebtedness. It contains no express authorization for incurring indebtedness. Its apparent purpose is to authorize procedures for property tax increment financing of urban renewal projects. The Tax Court opinion described how urban renewal increment financing works:

> "In simplified terms, a local government adopts an urban renewal plan to improve a blighted area. Typically, the local government sells bonds to redevelop the blighted area. When the area has been redeveloped, it should have a higher value for property taxation than prior to redevelopment.

> "When an urban renewal plan is adopted, the assessor determines and certifies the assessed value of all the taxable property in the urban renewal area as of the assessment date immediately prior to approval of the urban renewal plan. ORS 457.430. This amount becomes the certified or 'frozen value' from which the units of local government continue to collect property taxes. Taxes derived from any increase in

value over the 'frozen value' are dedicated to paying for redevelopment of the area. ORS 457.440(6).[1]

"Taxes for urban renewal are not levied by an urban renewal agency. Rather, they result from operation of the statutes. ORS 457.440(5)(a) directs the assessor to divide only the frozen value into the total amount of taxes levied by the taxing units to derive a tax rate. Thus, the tax rate is based on a total assessed value which is less than is actually subject to tax. The tax rate is then applied to the entire taxable value, including the value in excess of the frozen value, producing revenues in excess of the amounts levied by the taxing units. The excess is the amount, within certain limitations, dedicated to payment of urban renewal development." 12 OTR at 211 (footnote omitted).

*See generally Dennehy v. Dept. of Rev.*, 305 Or 595, 598-99, 756 P2d 13 (1988) (describing tax increment financing in similar terms).

## A. INTERPRETATION OF SUBSECTION (3)(a) EXEMPTION

■ We first consider the subsection (3)(a) exemption, which provides that the tax rate limitations "apply to all taxes imposed on property or property ownership except [t]axes imposed to pay the principal and interest on bonded indebtedness authorized by a specific provision of this Constitution." The Tax Court concluded that for the urban renewal provision to be "specific" within the terms of the exemption, "it must at least mention bonds or bonded indebtedness." 12 OTR at 214. Because it concluded that the urban renewal provision did not do so, the Tax Court held that property tax increment revenues were subject to Measure 5's tax rate limitations. *Ibid.*

The (3)(a) phrase "authorized by a specific provision of this Constitution" clearly refers to its immediate antecedent, "bonded indebtedness." Subsection (3)(a) thereby exempts taxes imposed to pay bonded indebtedness only if that bonded indebtedness is "authorized by a specific provision of [the Oregon] Constitution."

---

[1] City asserts that "[t]he bonds evidence the debt and irrevocably pledge the new property taxes generated by the urban renewal area to pay the debt."

The dissent disagrees on this point and concludes that the phrase "authorized by a specific provision of this Constitution" modifies the words "all taxes imposed." That conclusion is, however, belied by the grammar of subsection (3)(a), wherein "authorized" ordinarily would modify its closest noun or noun phrase, "bonded indebtedness." Moreover, if "authorized" were intended to refer to "taxes," the provision could have more clearly stated its meaning, by stating, for example: "taxes imposed to pay * * * bonded indebtedness *and* authorized by a specific provision of this Constitution"; or "taxes authorized by a specific provision of this Constitution and imposed to pay * * * bonded indebtedness." Finally, reference to the other Measure 5 exception, stated in subsection (3)(b), 314 Or at 182, reveals that it is construed in an exactly parallel manner to the exemption in subsection (3)(a), and that its substitute for the word "authorized" is the word "incurred," which clearly relates in context to "bonded indebtedness" and not to "taxes."

In the final analysis, we are convinced that the most usual grammatical reading of subsection (3)(a) and the identical structure of the exemptions in subsections (3)(a) and (3)(b) are the strongest indicators of the voters' intent. Consequently, we interpret subsection (3)(a) to exempt a tax imposed to pay bonded indebtedness if that bonded indebtedness is authorized by another specific provision of the Oregon Constitution.

Respondents assert that the term "specific provision" must mean something more than any discrete or identifiable provision, because such a definition would render the word "specific" merely redundant. The something more that they suggest is that a specific authorizing provision means one that *expressly* authorizes bonded indebtedness. Respondents further assert that the "authorization" required by subsection (3)(a) is a constitutional provision that expressly creates the authority for the bonded indebtedness, such as the provisions in Article XI of the Oregon Constitution that expressly authorize the state to issue bonds for various purposes. Or Const, Art XI-A, XI-E through XI-J.

City asserts that the term "specific provision" means a constitutional provision that *expressly or implicitly*

authorizes bonded indebtedness. City further asserts that "authorized" means "explicitly or implicitly allowed or particularly limited or regulated by the constitution."

As the positions of the parties demonstrate, the key phrase, "authorized by a specific provision of this Constitution," contains two separate but related terms that require interpretation, "authorized" and "specific provision." For the reasons set out below, we interpret the phrase "authorized by a specific provision of this Constitution" to mean that the constitutional provision must explicitly empower or sanction the incurring of bonded indebtedness.

Measure 5 did not use either the phrase "authorized by *a* provision of this Constitution" or the phrase "authorized by *any* provision of this Constitution." It used the phrase "authorized by a *specific* provision of this Constitution." (Emphasis added.) The adjective "specific" has several common meanings. One is something "specifying, explicit," The Random House Dictionary of the English Language 1832 (unabridged 1987), or something that is "characterized by precise formulation or accurate restriction," Webster's Third New International Dictionary 2187 (unabridged 1976). Another common meaning for "specific" is something "having a special application, bearing, or reference" or "peculiar or proper to * * * something, as qualities, characteristics, effects, etc." Random House, *supra* at 1832.

The first of these definitions fits more naturally into the context of subsection (3)(a), although the second definition is not inconsistent with the first. By requiring that the authorizing provision be explicit, the first definition of "specific" is consistent with the function that subsection (3)(a) performs, which is to identify a category of constitutional provisions that are exempt from the limitations of Measure 5. An explicit provision is one whose meaning and effect are clear and unambiguous, express and not implied. Thus, to the extent that "specific" furthers the categorizing function of subsection (3)(a), it does so by requiring that an exempt provision be clearly identifiable as one that explicitly authorizes bonded indebtedness.

We next consider the word "authorized" in subsection (3)(a). As with the term "specific," our interpretation of

the term "authorized" is more closely in accord with the position taken by respondents. "Authorized" means to give authority or official power, to empower, to formally or duly sanction. *See* Random House, *supra* at 139, and Webster, *supra* at 146, for definitions of "authorized" and "authorize." The City's proposed definition — that "authorized" means "explicitly or implicitly allowed or particularly limited or regulated by the constitution" — is a strained definition untethered to the common meaning of the word. We conclude that, in order to qualify as exempt from the limitations of Measure 5 pursuant to subsection (3)(a), an "authorizing" provision must explicitly empower or sanction the incurring of bonded indebtedness.

Earlier in this opinion we stated that one purpose of subsection (3)(a) is to exempt from Measure 5 limitations an identifiable category of constitutional provisions related to bonded indebtedness. A number of such identifiable provisions are in the Oregon Constitution. Although they are not presently financed by property tax revenues (which are the target of Measure 5), there are a variety of state-financed bonds explicitly authorized by provisions of Article XI of the Oregon Constitution. *E.g.*, Article XI-A, and XI-E through XI-J (dealing with veteran loans and higher education, as examples). Those provisions contain explicit language (such as "Bonds issued pursuant to this article * * *," Or Const, Art XI-F(1), § 4; or "Bonds of the State of Oregon * * * may be issued," Or Const, Art XI-F(2), § 1) authorizing the incurring of debt and the issuing of state-financed bonds, that constitutional authorization being necessary to avoid the general prohibition of Article XI, section 7, of the Oregon Constitution, that the "Legislative Assembly shall not lend the credit of the state nor in any manner create any debt or liabilities * * *." Provisions such as these are "specific provisions" that "authorize" bonded indebtedness within the meaning of subsection (3)(a).

This dovetailing of the common meaning of "authorized" with an explicitly identified range of constitutionally authorized bonded indebtedness for which taxes imposed for repayment would be exempt, leads us to conclude that subsection (3)(a) exempts from Measure 5 limitations taxes imposed to pay for bonded indebtedness if another provision of the

constitution explicitly empowers or sanctions the incurring of the bonded indebtedness.[2]

## B. THE MEANING AND EFFECT
## OF THE URBAN RENEWAL PROVISION

■    That brings us to the urban renewal provision, Article IX, section 1c. The legislature first passed laws in 1957, materially unchanged to the present, authorizing the creation of local urban renewal agencies and generally authorizing them to incur debt *and issue bonds. See* ORS 457.130 (1957), *renumbered* ORS 457.035 (creating urban renewal agencies); ORS 457.190(1) (1957) (authorizing an urban renewal agency to "borrow money * * * from any sources, public or private, for the purposes of undertaking and carrying out urban renewal projects"). The 1957 legislature also referred a constitutional amendment to the voters, which failed at the polls in 1958. The identical measure was referred by the 1959 legislature and was enacted at the general election in 1960, Article IX, section 1c (the urban renewal provision). Tax increment financing legislation was enacted in 1961, ORS 457.420 *et seq.*

The urban renewal provision states that the legislature "may provide" that property taxes may be divided so that revenues from increases in property values generated in redevelopment or urban renewal projects "shall be used to pay any indebtedness incurred for the redevelopment or urban renewal project." The provision concludes: "The legislature may enact such laws as may be necessary to carry out the purposes of this section."

The urban renewal provision relates directly and expressly, by its terms, to the subject of segregating and utilizing property tax increment revenues to pay for "any indebtedness incurred for the redevelopment or urban

---

[2] We conclude that tax increment financing revenues are "taxes" within the meaning of subsection (3)(a). 12 OTR at 213. Article XI, section 11b(2)(b) defines a "tax" for purposes of Measure 5 to mean "any charge imposed by a governmental unit upon property or upon a property owner as a direct consequence of ownership of that property except incurred charges and assessments for local improvements." Property taxes on urban renewal property clearly are a tax upon property and just as clearly do not fall within the exceptions for incurred charges and assessments for local improvements.

renewal project." The urban renewal provision states that *the legislature "may provide"* and *"may enact" laws* so that any urban renewal debt *shall* be paid from property tax increment revenues. The provision does not expressly or explicitly state that urban renewal agencies may issue or incur bonded indebtedness.[3] Authority to incur the indebtedness arises from ORS 457.190(1).

The 1960 Voters' Pamphlet is an important resource in establishing the voters' intent in adopting the urban renewal provision. The ballot title for the measure states:

"FINANCING URBAN REDEVELOPMENT PROJECTS — Purpose: To amend Constitution *to permit* payment of cost of urban renewal projects from the additional tax revenues resulting from increased valuation of the areas redeveloped." 1960 Voters' Pamphlet at 9 (emphasis added).

The statutory citizens' committee Explanation of the measure states:

"As the ballot title shows, this measure, while it relates to taxation, does not create or authorize the creation of any new or additional taxes. *If the measure is approved by the voters, it would permit the legislature to enact a statute authorizing municipalities to set aside the increase in property taxes* resulting from the additional value created by an urban renewal redevelopment project. *The portion of taxes thus set aside could be used to pay the indebtedness the municipality incurred in undertaking the project.*

"* * * * *

"The proposed constitutional amendment is not self executing. It is a 'permissive' measure, not a 'mandatory' one. *The voters by approving the measure will simply give the state legislature authority to pass such a law. After its passage municipalities* would not be required to take advantage of it, but *would have the right to do so." Id.* at 9-10 (emphasis added).

The citizens' committee Explanation makes it clear that the amendment would permit the legislature to enact a law

---

[3] Even though the urban renewal provision does not explicitly provide for bonded indebtedness, the term "any indebtedness incurred for the redevelopment or urban renewal project" permits or includes urban renewal bonded indebtedness. *See* footnote 4, *infra*, with respect to awareness by the legislature and the voters that the term "any indebtedness incurred for the redevelopment or urban renewal project" in the urban renewal provision included urban renewal bonded indebtedness.

authorizing localities both to engage in tax increment alloca-
tion of revenues and to set aside that revenue for the repay-
ment of urban renewal debt. The citizens' committee
Explanation also makes it clear that, if the amendment was
approved, the legislature could enact tax increment debt
financing laws to retire debt secured by property tax incre-
ment revenues.

The legislative committee Explanation of the mea-
sure makes the same points, even more forcefully. After
stating that the measure *"will provide the tools* to help
municipalities to raise their one-third of the cost" of urban
redevelopment projects (with the other two-thirds borne by
the federal government), the Explanation states:

> "With the plan that is proposed, the amount of money
> presently received from taxing the property would still be
> used by the various taxing bodies that receive them. *The
> constitutional amendment* only *provides that any increase in
> taxable value — and just the amount of the increase — would
> be applied toward paying off any indebtedness incurred in
> the development of the project.* * * *
>
> *"This* is not a self-enacting amendment but *will permit
> the Legislature to pass enabling legislation." Id.* at 10
> (emphasis added).

Although neither the measure itself, the ballot title,
nor the Voters' Pamphlet explanations of the measure
include the word "bond," the legislative history of the urban
renewal provision establishes that its advocates, the legisla-
ture that referred the measure, and the media reporting on
the measure understood that the measure related to the use
of property tax increment revenues to pay for any urban
renewal debt, including urban renewal bonds. *See State v.
Wagner,* 305 Or 115, 131-34, 752 P2d 1136 (1988) (re: sources
of legislative history for a referendum); Comment, *Tax Incre-
ment Financing for Development and Redevelopment,* 61 Or
L Rev 123, 136-39 (1982) (summarizing the legislative his-
tory).[4] Bonds secured by project-specific tax revenues pledged

---

[4] Some of the pertinent legislative history is summarized in Comment, *Tax
Increment Financing for Development and Redevelopment,* 61 Or L Rev 123, 137-39
(1982). Pertinent aspects of the 1960 legislative history include: (1) first and
foremost, the 1960 Voters' Pamphlet, discussed in text at pages 11-12, *infra;* (2) 1959
legislative consideration of the referendum, which demonstrates that the legislature
was aware that "revenue bonds" and the repayment of bonds were contemplated by

as security are commonly referred to as "revenue bonds." *See* note 4, *supra*; Black's Law Dictionary 1319 (6th ed 1990).[5]

Three conclusions follow. First, unlike the explicit state bond authorizing provisions found in Article XI of the Oregon Constitution, the urban renewal provision does not explicitly state that urban renewal agencies are authorized to incur or issue bonded indebtedness. (In fact, the general authority for urban renewal agencies to issue bonds first existed by statute in 1957, three years *before* the urban renewal provision was enacted.) Second, the urban renewal provision expressly authorizes legislation permitting local governments to set aside and utilize property tax increment revenues to pay for any urban renewal indebtedness. Third, further action by the Legislative Assembly was required. Passage of the urban renewal provision would *permit* the legislature to enact laws authorizing localities to engage in tax increment allocation of property tax revenues and to incur

the measure; (3) media coverage of the measure, which refers to the financing of urban renewal projects and, in an editorial just before the 1960 election, the Oregonian reiterated its support stated on "several past occasions" for the measure which would permit legislation to provide for "the retirement of urban renewal bonds." SJR 32: Minutes, Senate Committee on Taxation, March 20, 1959; House Committee on Taxation, April 10, 1959. The Oregonian, March 23, 1959, November 4 and 7, 1960; The Statesman, November 6, 1960.

Also pertinent, but of more attenuated significance, are the deliberations of the legislature and the voters on the identical measure in 1957 and 1958, respectively. The 1957 legislative process, like the process in 1959, had the same focus on repayment of bonds; the 1958 Voters' Pamphlet was not materially different from 1960, with the Explanation also stating that "the increase in taxes would be earmarked to retire urban renewal bonds." 1958 General Election Voters' Pamphlet at 19-20. HJR 36: Minutes, House Committee on Taxation, May 3, 1957; Senate Committee on Taxation, May 18, 1957. The media coverage was also similar to two years later, but more pointed, with the Oregonian making the clearest statement just before the election that the measure would "permit Oregon cities to finance redevelopment projects by sale of revenue bonds to be retired out of property tax increments realized as the result of such projects." The Oregonian, May 14 and 21, 1957, November 3, 1958. After the 1958 election, the Oregonian reported that "the self-liquidating proposal for urban renewal revenue bonds * * * received its death blow in Multnomah." The Oregonian, November 7, 1958.

[5] Before the publication of the 1960 Voters' Pamphlet, there is only one direct reference in the legislative history to the need for a *constitutional* amendment to accomplish the legislative purpose. A representative of the Portland Development Commission testified on the predecessor measure in 1957 that "[i]t seemed advisable to amend [the constitution] to make the bonds which are sold to provide the one-third amount provided locally, more attractive to the bonding companies." Hearings on HJR 36, House Committee on Taxation, May 3, 1957, Minutes at 1.

debt, including bonded debt, for urban renewal projects secured by tax increment property tax revenues set aside for the repayment of the debt. Based on the information available to them, the voters would have been entitled to conclude that, *if the amendment were approved, then* there would be legislative authority to enact tax increment debt financing laws.

## C. THE URBAN RENEWAL PROVISION IS NOT A SPECIFIC AUTHORIZING PROVISION

■ ■ Having assayed the text of the provision and its history, we turn to the dispositive question: Does the urban renewal provision explicitly empower or sanction the incurring of bonded indebtedness? We hold that it does not. The 1960 amendment empowers or sanctions a particular form of repayment for debt, even including by implication bonded debt, but does not explicitly empower or sanction the incurring of debt or bonded debt itself. Taxes imposed to pay off urban renewal bonded debt do not, therefore, qualify for the exemption from Measure 5 limitations provided by subsection (3)(a).

In reaching this conclusion, we rely significantly on the fact that the urban renewal provision, unlike the exempt state bond authorizing provisions in Article XI, does not state either that "urban renewal agencies may issue bonds and incur bonded debt" or that "urban renewal agencies may issue bonds and incur bonded debt secured by tax increment financing revenues." The term "bonded indebtedness" does not appear in the urban renewal provision. The term "bonded indebtedness" does not appear in either the 1960 Ballot Title or in any of the statements in the 1960 Voters' Pamphlet. We also deem it significant that general statutory authority for urban renewal agencies to issue bonds and to incur bonded debt preceded the constitutional amendment by three years. In order to qualify for the exemption provided by subsection (3)(a), a constitutional provision needs to do more than recognize a financing mechanism for the repayment of any debt.

The office of the urban renewal provision was not to *authorize* indebtedness. It was passed to provide a means of paying for indebtedness, bonded or otherwise, authority for which already existed under ORS 457.190.

The urban renewal provision itself only authorizes legislation. Before any revenue bonds can be issued thereunder, implementing legislation is required. Unlike other Article XI constitutional provisions referred to above, Article IX, section 1c, expressly conditions incurring indebtedness on the enactment of laws "to carry out the purposes of this section." It may be that Article IX, section 1c, is the constitutional basis for urban renewal increment financing; but the *authority* for local governments to incur urban renewal bonded indebtedness is found in a statute, ORS 457.190.

Subsection (3)(b) of Measure 5 also provides direction in interpreting subsection (3)(a). Subsection (3)(b) lists an exemption for taxes imposed to pay for *general obligation bonds* for capital construction or improvements, *provided that the bonds were issued before the passage of Measure 5, or thereafter, but only with specific voter approval.* That exemption demonstrates that the drafters knew how to exempt a particular class of local bonds in a focused provision. More significantly, subsection (3)(b) exempts only general obligation bonds, not revenue bonds, and then only those already issued or those issued later with voter approval. Measure 5 did not intend that future general obligation bonds be exempt only with voter approval, and that revenue bonds be exempt without voter approval.

One last point. Taking a step back from the wording of the exemption itself, and looking at the entire measure, it would be inconsistent with the overall purpose of Measure 5 to limit property taxes for the entire range of municipal services within its orbit, but then to exclude property taxes for repayment of urban renewal bonds from its coverage. It seems unlikely that Measure 5 intended to limit funding for police, fire, jails, roads, parks, and human services, but to place no limits on spending for urban renewal.

■ For the foregoing reasons, we agree with the Tax Court that Article IX, section 1c, of the Oregon Constitution is not a specific provision authorizing bonded indebtedness and therefore does not qualify for the exemption stated in Article XI, section 11b(3)(a), of the Oregon Constitution. Accordingly, the judgment of the Tax Court is affirmed.[6]

---

[6] Intervenors Dorothy M. Smith and Peter M. Smith cross-appealed, assigning as error the Tax Court's denial of their request for attorney fees. Attorney fees are

**GRABER, J.,** dissenting.

I dissent. The majority reads the Article XI, section 11b(3)(a), exception from the property tax limitation to apply only when a specific provision of the Oregon Constitution authorizes bonded indebtedness. It then reads Article IX, section 1c, not to authorize bonded indebtedness. I disagree with both points. In my view, the exception applies when a specific provision of the constitution authorizes the imposition of taxes to pay the principal and interest on bonded indebtedness; and the majority agrees that Article IX, section 1c, at least does that. Moreover, in my view, Article IX, section 1c, authorizes bonded indebtedness as well.

### A. INTERPRETATION OF
### SUBSECTION (3)(a) OF MEASURE 5

Article XI, section 11b, of the Oregon Constitution (Measure 5) limits the taxes that may be imposed on any property by limiting tax rates. Article XI, section 11b(3)(a) contains the following exception:

> "(3)   The limitations of subsection (1) of this section apply to all taxes imposed on property or property ownership except[:]
>
> "(a)   Taxes imposed to pay the principal and interest on bonded indebtedness authorized by a specific provision of this Constitution[.]"

That provision is ambiguous. The phrase "authorized by a specific provision of this Constitution" could modify the antecedent noun, "bonded indebtedness," as the majority holds, or it could modify the antecedent phrase, "[t]axes

---

not recoverable in cases such as this. *See Dennehy v. Dept. of Rev.*, 308 Or 423, 427, 781 P2d 346 (1989) ("[T]he Tax Court * * * may, under appropriate circumstances, award attorney fees to taxpayers in personal income tax, gift, and inheritance cases. There is no similar provision concerning appeals involving property tax assessments. Where the legislature has chosen to make attorney fees available in a limited number of situations, it is inappropriate for this court to expand on the legislative decision. The Tax Court had no statutory authority to award attorney fees." (citations and footnote omitted)).

Moreover, intervenors did not bring this proceeding. True, they intervened. Factually, this case differs from *Deras v. Myers*, 272 Or 47, 535 P2d 541 (1975), our seminal case in this area.

imposed to pay the principal and interest on bonded indebtedness." Although both readings are plausible, the latter reading is more correct.

First, the parallel structure between the main part of subsection (3) and paragraph (a) suggests the latter reading. Subsection (3) states that Measure 5's limitations apply to "all taxes imposed" except those delineated in paragraphs (a) and (b). Paragraph (a) tracks the same wording, excepting "[t]axes imposed to" meet certain specified purposes. The grammatical aim of subsection (3) and paragraph (a) is to describe taxes.

Second, the overriding purpose of Measure 5 is to limit the *taxes* that may be imposed on any property by limiting tax rates. *Coalition for Equit. School Fund. v. State of Oregon*, 311 Or 300, 310, 811 P2d 116 (1991). The focus of *all* of Measure 5 is on taxes. Reading subsection (3)(a) to identify a particular kind of *tax* as excepted suggests that the phrase "authorized by a specific provision of this Constitution" relates to "[t]axes imposed to" fulfill the specified purposes.

For those reasons, the inquiry should be whether a specific provision of the Oregon Constitution authorizes the imposition of taxes to pay the principal and interest on bonded indebtedness.

## B. INTERPRETATION OF ARTICLE IX, SECTION 1c

1. *Authorizing Taxes Imposed to Pay the Principal and Interest on Bonded Indebtedness.*

Article IX, section 1c, of the Oregon Constitution (the urban renewal provision) provides:

> "The Legislative Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment or urban renewal project, may be divided so that the taxes levied against any increase in the true cash value, as defined by law, of property in such area obtaining after the effective date of the ordinance or resolution approving the redevelopment or urban renewal plan for such area, shall be used to pay any indebtedness incurred for the redevelopment or urban renewal

project. The legislature may enact such laws as may be necessary to carry out the purposes of this section."

The majority holds that "[t]he 1960 amendment [the urban renewal provision] empowers or sanctions a particular form of repayment for debt [tax increment financing], even including by implication bonded debt." 314 Or at 192. That form of repayment, as the majority correctly explains, is by imposing a tax. *Id.* at 188 n 2. Under the urban renewal provision, if implemented by legislation, *ad valorem* taxes levied by any taxing unit containing an urban renewal project may be divided so that the taxes levied against any increase in the true cash value of property *"shall* be used to pay *any* indebtedness incurred" for the project. Article IX, § 1c (emphasis added). In short, the urban renewal provision relates directly to the subject of tax increment financing to pay for all urban renewal indebtedness, including bonded indebtedness, and the urban renewal provision expressly authorizes the legislature to enact the necessary laws to carry out the purposes of tax increment financing. The urban renewal provision qualifies as a specific provision of the Oregon Constitution that authorizes taxes imposed to pay the principal and interest on bonded indebtedness.

## 2. *Authorizing Bonded Indebtedness.*

Even accepting everything that the majority says in Parts A and B of its opinion, it reaches the wrong conclusion. When adopted, the urban renewal provision in fact authorized a form of bonded indebtedness that was not previously used. Stated differently, the voters in 1960 enacted a constitutional amendment to empower or sanction the incurring of a particular form of bonded indebtedness secured by a pledge of property tax increment revenues.

The urban renewal provision *expressly* authorizes the legislature to enact laws to provide for allocation of urban renewal property tax increment revenues that "shall" secure the repayment of any urban renewal indebtedness, which term, *by definition,* includes urban renewal bonded indebtedness. The urban renewal provision thereby *expressly* authorizes the legislature to enact laws so that localities may issue revenue bonds. The meaning and effect of the express terms of the urban renewal provision are to empower or sanction

the incurring of indebtedness, specifically the incurring of bonded indebtedness secured by property tax increment revenues (*i.e.*, revenue bonds).[1]

Indeed, the voters believed that, by enacting the urban renewal provision, they would thereby permit the legislature to enact laws authorizing localities both to engage in tax increment allocation of revenues *and* to incur debt, including bonded debt, secured by property tax increment revenues. The measure was viewed as a means to *"provide the tools* to help municipalities to raise their one-third of the cost"* of urban renewal projects, approving a method for local governments to raise money for these projects. 314 Or at 190 (emphasis in majority). It is clear, not only that the voters believed that the constitutional amendment was necessary to permit the incurring of bonded indebtedness secured by property tax increment revenues (issuance of revenue bonds), but also that the amendment itself facially purports to authorize the legislature to enact such laws as may be necessary toward that end.

I am aware that the urban renewal provision does not state either that "urban renewal agencies may issue bonds and incur bonded debt" or that "urban renewal agencies may issue bonds and incur bonded debt secured by tax increment financing revenues." 314 Or at 192. The majority considers this lack of an express facial reference to bonds to be critical. Yet, no one disputes that bonds are the principal form of urban renewal debt. The express term, *"any* indebtedness incurred for the redevelopment or urban renewal project"

---

[1] Although it appears that the voters and the legislature believed that the amendment *empowered* the legislature in this area, this court stated in another context that the "Legislative Assembly has plenary authority to legislate within constitutional limits and did not need authorization by Article IX, section 1c, except to allay possible doubts about such limits." *Dennehy v. Dept. of Rev.*, 305 Or 595, 602, 756 P2d 13 (1988). *Dennehy* does not stand for the proposition that the authorization was unnecessary (it acknowledges the possibility of doubts concerning the limits of the legislative authority), nor does it conclude that the urban renewal provision did not, in fact, authorize or purport to authorize tax increment debt financing. *Dennehy* does, on the other hand, at least stand for the proposition that, if there were any doubts about the legislature's authority to provide for tax increment debt financing, then the urban renewal provision clearly *sanctioned* tax increment debt financing. *See also* Comment, *Tax Increment Financing for Development and Redevelopment*, 61 Or L Rev 123, 139 (1982), concluding that the provision is a "reinforcement" of legislative power.

(Art IX, § 1c (emphasis added)), includes its principal component, urban renewal bonds. The majority's position is that that is not explicit enough, as if a provision authorizing the legislature to "enact such laws as may be necessary to buy any animals with black and white stripes" would not be a provision authorizing the state to own zebras, because it described the intermediate step of purchase and included other black and white striped animals. I am not convinced. The very purpose of Article IX, section 1c, is to authorize local utilization of tax increment bonds.

I am also aware that general statutory authority for urban renewal agencies to issue bonds and incur bonded debt preceded the constitutional amendment by three years. 314 Or at 191. It was, however, unclear whether the 1957 general statutory authority to incur debt extended to the issuance of bonds secured by a pledge of property tax increment revenues. The prior existence of general statutory authority in no way precludes the people from enacting a constitutional provision, the purpose of which is to empower or sanction the specific practice of offering bonds. The majority would, inappropriately, add two requirements to subsection (3)(a) of Measure 5, by reading it to except taxes imposed to pay the principal and interest on bonded indebtedness if a specific provision of the constitution authorizes *every form of* bonded indebtedness for a given purpose and authorizes bonded indebtedness for that purpose *for the first time*. Neither requirement appears in Measure 5.

Finally, the majority relies on its view as to what the voters likely would have thought about the issue before us. 314 Or at 193. The majority cites no authority for its view. It bears noting that there is no indication whatever in the text or history of Measure 5 that its effect on taxes imposed to repay urban renewal debt was ever considered, one way or the other, by the sponsors of the measure.

It is just as likely that the voters who adopted Measure 5 did not intend to enact a system that could force a locality to have insufficient funds to repay bonds that were secured by a pledge of dedicated tax revenues and did not intend to cripple the 30-year program of tax increment bond financing that the voters had adopted in 1960. Measure 5 and the urban renewal provision share some common objectives:

both result in lower taxes in the long run; both favor the use of public funds to benefit particular areas of the taxing jurisdiction that are in need of improvements; and both recognize the importance of government bond programs to the economic health of Oregon.

More importantly, the majority's and my assertions about what the voters would have thought had they been presented with this issue are beside the point. Our task is to interpret subsection (3)(a) of Measure 5, as written, and then to shift our focus to whether the urban renewal provision, as written, meets the requirements of that exception.

I conclude that property tax increment revenue to repay bonded indebtedness, provided for in Article IX, section 1c, is exempt from the limitations of Measure 5 pursuant to Article XI, section 11b(3)(a), of the Oregon Constitution. I would reverse the judgment of the Tax Court and, accordingly, dissent.

Richardson, J. pro tempore, joins in this dissent.