Argued and submitted May 18, Ballot Measure Explanatory Statement certified as modified May 27, 1993

## Gary L. CONKLING,
*Petitioner,*

*v.*

## Phil KEISLING,
in his capacity as
Secretary of State of the State of Oregon,
and Shirley Gold, Cedric Hayden, Don McIntire,
Gail Shibley and Barbara Seymour,
in their capacities as members of the
explanatory committee for Ballot Measure One,
*Respondents.*

(SC S40199)

852 P2d 183

James N. Gardner, of Gardner, Cosgrove & Gardner, Portland, argued the cause for petitioner. With him on the petition was Lynda Nelson Gardner.

Richard D. Wasserman, Assistant Attorney General, Salem, waived appearance for respondents.

GILLETTE, J.

Van Hoomissen, J., concurred and filed an opinion.

## GILLETTE, J.

This is an original proceeding for judicial review of a Ballot Measure Explanatory Statement[1] for Ballot Measure No. 1, a proposed constitutional amendment. Petitioner is an elector of this state who is dissatisfied with that statement. Respondent Keisling, as Secretary of State, is responsible for placing the Explanatory Statement in the Voters' Pamphlet. The other respondents make up the committee that, pursuant to ORS 251.205, prepared the Explanatory Statement. The measure deals with urban renewal funding. By action of the 1993 Legislative Assembly, it is to be submitted to the people at a special election in June 1993. We conclude that the Explanatory Statement for the proposed measure is insufficient in some respects. We modify the Explanatory Statement accordingly and, as modified, certify it.

Article IX, section 1c, of the Oregon Constitution, which governs the use of taxes to fund urban renewal projects, presently provides:

"The Legislative Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment or urban renewal project, may be divided so that the taxes levied against any increase in the true cash value, as defined by law, of property in such area obtaining after the effective date of the ordinance or resolution approving the redevelopment or urban renewal plan for such area, shall be used to pay any indebtedness incurred for the redevelopment or urban renewal project. The legislature may enact such laws as may be necessary to carry out the purposes of this section."

In November 1990, Oregon voters passed an initiative measure (commonly referred to as "Measure 5") that limited the taxes that could be imposed on any property by setting limitations on tax rates. *See generally, Coalition for Equit. School Fund. v. State of Oregon*, 311 Or 300, 310, 811 P2d 116 (1991) (discussing operation of Measure 5). In *City of Portland v. Smith*, 314 Or 178, 192-93, 838 P2d 568 (1992),

---

[1] For a description of Explanatory Statements, their purpose, and the manner in which they are prepared, see *Teledyne Industries v. Paulus*, 297 Or 665, 667-69, 687 P2d 1077 (1984). For a discussion of this court's methodology in examining and scope of review concerning Explanatory Statements, see *June v. Roberts*, 310 Or 244, 247-48, 797 P2d 357 (1990).

this court determined that the tax rate limitations of Measure 5 applied to tax revenues that would be used by a municipality to pay bonded indebtedness incurred by the municipality to finance urban renewal projects. Proposed Ballot Measure No. 1 (1993) is the Legislative Assembly's response to that ruling.

Ballot Measure No. 1 would amend present Article IX, section 1c, by adjusting certain terminology within the existing provision and by adding a second paragraph to it. The measure provides (deletions in brackets and italics; additions in bold):

"**(1)** The Legislative Assembly may provide that the ad valorem taxes levied by any taxing unit, in which is located all or part of an area included in a redevelopment or urban renewal project, may be [*divided*] **calculated** so that the taxes [*levied against*] **from** any increase in the [*true cash*] **real market** value, as [*defined*] **provided** by law, of property in such area [*obtaining*] **occurring** after the effective date of the ordinance or resolution approving the redevelopment or urban renewal plan for such area, shall be used to pay any indebtedness incurred for the redevelopment or urban renewal project. The legislature may enact such laws as may be necessary to carry out the purposes of this section.

"**(2)** **The limitations of section 11b, Article XI of this Constitution, shall apply to taxes from any increase in the real market value described in subsection (1) of this section unless a majority of the electors residing in the area subject to the taxes and voting on the question specifically (A) authorize bonded indebtedness for redevelopment or urban renewal projects, or (B) authorize the levy of taxes not subject to the limitations of section 11b, Article XI of this Constitution, for the purpose of paying the principal and interest on outstanding bonded indebtedness previously issued to finance an urban renewal or redevelopment project or projects. This subsection shall apply only to bonded indebtedness approved at an election held on or after the date of the election at which this subsection is approved.**"

Respondent committee members prepared and submitted the following Explanatory Statement for Ballot Measure No. 1:

"EXPLANATORY STATEMENT
JUNE 29, 1993 ELECTION,
BALLOT MEASURE ONE

"Prior to 1990, taxes to finance urban renewal projects were included but not itemized in property tax statements.

In November 1990, Oregon voters approved Measure 5 and amended the constitution in order to limit most property taxes. Now, taxes to finance urban renewal projects fall within Measure 5's limits.

"1993's Ballot Measure One is a proposed constitutional amendment which, if adopted, will allow voters in a city or county to either authorize bonded indebtedness for urban renewal projects or authorize taxes to pay existing urban renewal bonded indebtedness. In either case, such taxes will be outside Measure 5's limits.

"Voters may thus authorize, with a single vote, future urban renewal indebtedness on either a project-by-project or multiple-project basis, depending on what the governing body of the city or county submits to its voters. If city or county voters so authorize, property taxes for urban renewal in their city or county may increase with no further votes. The resulting taxes will be levied on all properties in the locality. Some properties may be within one urban renewal district; other properties may be within more than one urban renewal district.

"Some urban renewal plans involve projects which are not capital construction or improvements. These projects include, but are not limited to, acquisition and sale of land, relocation of persons and businesses displaced by the project, leasing or management of housing, grants and loans. Taxes for these local projects will be permitted outside Measure 5's limits if:

"(1)  Oregon voters approve Ballot Measure One; and if,

"(2)  city or county voters approve a local measure authorizing such funding.

"This measure also makes some changes to the existing section of the Oregon Constitution governing urban renewal taxes. The change from 'true cash' to 'real market' brings the section into conformity with Measure 5. The change from 'divided' to 'calculated' reflects the fact that division is only one of the calculations used in determining urban renewal taxes."

Petitioner charges that the Explanatory Statement is "insufficient and unclear" — the operative language in our judicial review statute, ORS 251.235[2] — in a number of respects.

---

[2] ORS 251.235 provides:

"Any person dissatisfied with an explanatory statement for which suggestions were offered at the Secretary of State's hearing under ORS 251.215, may

■ Petitioner first argues that the opening paragraph of the Explanatory Statement is insufficient and unclear. Petitioner complains that the first paragraph begins with a sentence that describes what essentially was a bookkeeping practice (the fact that urban renewal taxes were not separately denoted on individual tax assessment notices), but then goes on in the balance of the paragraph to explain that "now" taxes that finance urban renewal projects fall within Measure 5's limits. Petitioner asserts that "[i]t would be far clearer and less confusing to voters" instead to begin the Explanatory Statement with some explanation of the principal effect of the measure.

We agree with petitioner that the first sentence of the Explanatory Statement does not tell the voters anything that is pertinent to Ballot Measure No. 1. We also agree that the first sentence has no particular connection with the rest of the paragraph whose overall function, we believe, is to put the voter "in the picture" as to the circumstance that Ballot Measure No. 1 is intended to address. We think, however, that the problem is adequately remedied simply by striking the first sentence and by eliminating the word "now" in the last sentence. The first paragraph of the Explanatory Statement thus would read:

> "In November 1990, Oregon voters approved Measure 5 and amended the constitution in order to limit most property taxes. Taxes to finance urban renewal projects fall within Measure 5's limits."

■ Next, petitioner complains that the Explanatory Statement contains what he describes as a "blatant error," *viz.*, a sentence that states: "Some properties may be within one urban renewal district; other properties may be within

petition the Supreme Court seeking a different statement and stating the reasons the statement filed with the court is *insufficient or unclear.* * * * [T]he court shall review the statement, hear arguments and certify an explanatory statement to the Secretary of State. The review by the Supreme Court shall be conducted expeditiously to insure the orderly and timely conduct of the election at which the measure is to be submitted to the electors. The statement certified by the court shall be the explanatory statement printed in the voters' pamphlet."

(Emphasis added.) By interpretation, this court tests an Explanatory Statement against the standards enunciated in ORS 251.215(1) — impartiality, simplicity, and understandability — as well as against the standards specifically set out in ORS 251.235. *Sollis v. Hand*, 310 Or 251, 255, 796 P2d 1188 (1990) (citing *Teledyne Wah Chang Albany v. Powell*, 301 Or 590, 592, 724 P2d 319 (1986)).

more than one urban renewal district." Pejorative adjective aside, petitioner's point is well taken. ORS 457.420(3) expressly states: "Property may not be included in more than one urban renewal area."[3] The appropriate adjustment is to strike the incorrect sentence.

■ Petitioner next objects to the failure of the Explanatory Statement to define "urban renewal districts." We agree that a definition might be helpful. (It also could prove to be an abundant source of argument.) We do not agree that the Explanatory Statement is insufficient or unclear without one.

■ Petitioner attacks what he views as inappropriate highlighting, in the Explanatory Statement, of what he describes as "less common forms of urban renewal districts (*i.e.*, those which *do not* involve capital construction) rather than the most common forms of urban renewal districts (*i.e.*, those which *do* involve capital construction or improvements)." (Emphasis petitioner's.) We reject this argument, because it is an assertion of opinion based on facts not available to us. It is not our task to second-guess the committee that prepares Explanatory Statements on such questions. *See, e.g., June v. Roberts*, 310 Or 244, 247-48, 797 P2d 357 (1990) (the petitioner has "laboring oar" in these proceedings; it is not court's role to resolve disputes over meaning of the measure).

Petitioner makes a similar attack on the inclusion, in the fourth paragraph of the Explanatory Statement, of a reference to urban renewal projects as including the "leasing or management of housing." Such activities, petitioner asserts, "are infrequently if ever pursued" as urban renewal projects. We do not have any way from the record in this case to know that and, in any event, we do not agree with petitioner's unspoken premise that the infrequency of an urban renewal practice automatically disqualifies it from mention in an Explanatory Statement.

---

[3] For the purposes of this discussion, we understand the word "area" in ORS 457.420(3) to have the same meaning as the word "district" in the Explanatory Statement, *i.e.*, a geographically identifiable portion of property within a taxing unit or units that is to be targeted for urban renewal through the tax financing process authorized by Article XI, section 1c, of the Oregon Constitution.

Finally, petitioner attacks the Explanatory Statement as being confusing in a manner that we will not set out at length here. It is sufficient to state that we have considered petitioner's contention in this regard and that we disagree with it.

■ One other problem with the Explanatory Statement has come to our attention during this proceeding. It is the failure of the committee to include in subparagraph (2) following the fourth paragraph of the Explanatory Statement some recognition of the fact that the vote there referred to can occur only after Ballot Measure No. 1 has itself been approved. Accordingly, we have inserted the word "later" in subparagraph (2).

Our decision in this case is in no sense an endorsement of the way in which the balance of the Explanatory Statement is written, but we do not consider ourselves to have been placed at large to write what we believe to be a better Explanatory Statement. *See June v. Roberts, supra,* 310 Or at 247 (so holding concerning our authority under ORS 251.235).

Pursuant to ORS 251.235, we certify the following Explanatory Statement to the Secretary of State:

### EXPLANATORY STATEMENT
### JUNE 29, 1993 ELECTION,
### BALLOT MEASURE ONE

In November 1990, Oregon voters approved Measure 5 and amended the constitution in order to limit most property taxes. Taxes to finance urban renewal projects fall within Measure 5's limits.

1993's Ballot Measure One is a proposed constitutional amendment which, if adopted, will allow voters in a city or county to either authorize bonded indebtedness for urban renewal projects or authorize taxes to pay existing urban renewal bonded indebtedness. In either case, such taxes will be outside Measure 5's limits.

Voters may thus authorize, with a single vote, future urban renewal indebtedness on either a project-by-project or multiple-project basis, depending on what the governing body of the city or county submits to its voters. If a city or county's voters so authorize, property taxes for urban renewal in their city or county may increase with no further

votes. The resulting taxes will be levied on all properties in the locality.

Some urban renewal plans involve projects which are not capital construction or improvements. These projects include, but are not limited to, acquisition and sale of land, relocation of persons and businesses displaced by the project, leasing or management of housing, grants and loans. Taxes for these local projects will be permitted outside Measure 5's limits if:

(1)  Oregon voters approve Ballot Measure One; and if,

(2)  city or county voters later approve a local measure authorizing such funding.

This measure also makes some changes to the existing section of the Oregon Constitution governing urban renewal taxes. The change from "true cash" to "real market" brings the section into conformity with Measure 5. The change from "divided" to "calculated" reflects the fact that division is only one of the calculations used in determining urban renewal taxes.

Ballot Measure Explanatory Statement certified as modified.

Pursuant to ORAP 11.30(10) and notwithstanding ORAP 9.25(1), this certified Ballot Measure Explanatory Statement will become effective when the appellate judgment issues. The State Court Administrator shall issue the appellate judgment on June 1, 1993, unless a petition for reconsideration is both filed with and physically received by the Office of the State Court Administrator by 5 p.m. on May 28, 1993. A timely petition for reconsideration will stay issuance of the appellate judgment until the court acts on all timely petitions for reconsideration.

**VAN HOOMISSEN, J.,** concurring.

I concur in Justice Gillette's opinion.

I write, to separately record my concerns about (1) the "readability" of the citizens committee's explanatory statement, and (2) the manner in which this case was presented for review.

The citizens committee appointed under ORS 251.205(1) is charged to prepare and file with the Secretary of State an "impartial, simple and understandable statement

[not to exceed 500 words] explaining the measure and its effect." ORS 251.215(1).[1]

Having participated in this court's decision in *City of Portland v. Smith*, 314 Or 178, 838 P2d 568 (1992), I am familiar with the issues presented by Ballot Measure 1. Nevertheless, when I first read the committee's statement, I found it very difficult to understand. I was forced to reread the statement to try to understand it. Even then, I found it difficult to understand. In no way can that statement fairly be described as being a "simple and understandable statement explaining the measure and its effect." ORS 251.215(1).

To test this conclusion, I subjected the citizens committee's statement to a "Flesch" test. *See* ORS 250.039.[2] I was not surprised to find that the Flesch Index for the committee's statement is 33.673, indicating that the statement is "complex" and that it would be "difficult" for an average voter to read and understand. According to the Flesch standard, a reader would need a 14th grade level of education to understand the citizens committee's statement.

Petitioner's alternative explanatory statement is even worse. The Flesch Index for petitioner's statement is 30.161, indicating that the statement is "complex" and would be difficult for the average voter to read and understand. A reader would need a 16th grade level of education to understand the petitioner's alternative statement.

---

[1] This procedure is different from that followed in most state ballot measures, where the ballot title including the measures' summary, is prepared by the Attorney General. ORS 250.065(3).

[2] ORS 250.039 provides:

"For all measures, the Secretary of State by rule shall designate a test of readability and adopt a standard of minimum readability for a ballot title. The ballot title shall comply with the standard to the fullest extent practicable consistent with the requirements of impartiality, conciseness and accuracy."

OAR 165-14-045 provides in part:

"(1) ORS 250.[039] provides that the Secretary of State shall designate a test of readability and adopt a standard of minimum readability for a ballot title.

"(2) The Flesch Formula for Readability is designated as the test for readability of a ballot title. Attainment of a specified readability level shall be complied with to the fullest extent practicable, consistent with the needs of impartiality, conciseness and accuracy. A Reading Ease Score of not less than 60 is adopted as the standard of minimum readability for this test."

This court's certified explanatory statement is almost as bad. Its Flesch Index is 34.677. It, too, is complex and will be difficult for the average voter to read and understand. A reader would need a 14th grade level of education to understand this court's certified explanatory statement.

Petitioner, however, did not challenge the citizens committee's statement on "readability" grounds. Nor is it clear that the requirements of ORS 250.039 apply to ORS 251.205 *et seq.*[3] Suffice it to say that I seriously doubt that either the committee's statement or this court's statement satisfies the statutory mandate that the statement to be printed in the voters' pamphlet should be "simple and understandable." ORS 251.215(1).

Next, no party appeared in this court to defend the committee's statement. ORS 251.215 does not require the Secretary of State to defend a Voters' Pamphlet explanatory statement prepared by a citizens committee.[4] Nor is the citizens committee legally obliged to do so. *Teledyne Industries v. Paulus*, 297 Or 665, 669-71, 687 P2d 1077 (1984). The statutory scheme is silent as to the committee's prerogative or duty to defend its handiwork and as to provisions for counsel to represent the committee should it choose to do so. The committee, thus, appears to be an orphan. On the other hand, petitioner was represented by counsel, who submitted a well-considered brief and made a persuasive oral argument. Because neither the committee nor the Secretary of State was represented in this court, no response was made to petitioner's brief or to his oral argument. Worse yet, several questions about the committee's statement that appeared to trouble members of the court during oral argument went unanswered.

To illustrate:

Petitioner argued, and this court ultimately agrees, that the first sentence of the committee's statement does not tell the voters anything that is pertinent to Ballot Measure 1, and that that sentence has no particular connections with the

---

[3] The legislature should make the policy contained in ORS 250.039 specifically applicable to ORS 251.205(1).

[4] The Attorney General advised this court that the Secretary of State waived appearance in this case.

rest of the paragraph. I, for one, would like to have heard what the committee intended when it wrote the first paragraph in its statement.

Next, why did the committee make a statement that, apparently, is flatly inconsistent with ORS 457.420(3) (property may not be included in more than one urban renewal area)? Was the committee unaware of the provisions of that statute? If not, has this court mistakenly stricken language from the committee's statement simply because the committee failed to appear in this court to defend its statement?

Third, although I understand the burden of proof is on the challenger in these cases, I am troubled when, in effect, the *author* of the statement defaults on review.

The legislature should consider some mechanism to ensure that a response is presented in a case such as this. By definition, a referendum is of sufficient importance that this court is entitled to hear *both sides* of the argument before it is asked to resolve a dispute between the citizens committee and a challenger who asserts that the committee's explanatory statement does not satisfy the statutory directive found in ORS 251.215(1).

Finally, were I modifying the explanatory statement, I would omit the last paragraph in this court's certified explanatory statement. That paragraph deals exclusively with technical and conforming provisions of the measure; its inclusion in the Voters' Pamphlet contributes nothing to the goal of providing the voters with a "simple and understandable statement explaining the measure and its effect." ORS 251.215(1). Moreover, omitting that paragraph would improve the "readability" of this court's modified explanatory statement. Petitioner, however, does not challenge that paragraph.